NEW AMSTERDAM CASUALTY COM-
PANY, Appellant,

v.

NOVICK TRANSFER COMPANY, Inc.,
Appellee.

No. 7957.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 20, 1959.

Decided Jan. 6, 1960.

Paul F. Due, Baltimore, Md. (Due, Nickerson, Whiteford & Taylor, Baltimore, Md., on brief) for appellant.

Frederick J. Green, Jr., and Melvin J. Sykes, Baltimore, Md., for appellee.

Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

This is an action for contribution brought by New Amsterdam Casualty Company (hereinafter referred to as "New Amsterdam") as subrogee of certain parties trading as E. A. Gallagher & Sons (hereinafter referred to as "Gallagher"), William W. Sechrist and Buster Miller against Novick Transportation Company, Inc. (hereinafter referred to as "Novick") as an alleged joint tortfeasor. The case was tried before a jury and, from a judgment entered upon a verdict in favor of Novick, New Amsterdam appeals.

New Amsterdam insured a tractor-trailer which was, on November 21, 1955, driven by William W. Sechrist, owned by Buster Miller, and being used to haul a heavy load of flat steel in interstate commerce for Gallagher on U. S. Route 40 near State Route 72 in the State of Maryland. It was traveling in a generally northeasterly direction. At the same time and place, Harold Dyke was driving his own tractor in the same direction, hauling steel rods, bars or rails for Novick in interstate commerce in a trailer owned by Novick, an I. C. C. carrier, under a lease agreement between Dyke and Novick.

Shortly before five o'clock in the morning, and in darkness, an accident occurred in which Dyke sustained severe and permanent personal injuries. The highway at that point consisted of two divided paved surfaces with two traffic lanes in each direction, the right or outside lane of each division of the highway being referred to as the "slow lane", and the left or inside lane of each division being described as the "fast lane".

The pieces of steel being transported in the Novick trailer were manufactured by Cumberland Steel Company and were loaded in the trailer by the manufacturer in Cumberland, Maryland. The surface of the steel was delicately textured with a highly polished finish and special equipment was used in the loading process to prevent damage. The rods or rails were covered with a greasy substance, described as similar to "vaseline", to protect the surfaces from moisture and other damage. The Novick trailer load consisted of 252 pieces of "cold finished bars" running from $1\frac{1}{4}$ to $2\frac{1}{16}$ inches in diameter, from 20 to 24 feet in length and weighing about $16\frac{1}{2}$ tons. After the loading was completed, the trailer was taken to the Novick Terminal at Cumberland for inspection by Novick employees. The sides and ends of the body of the trailer were of steel construction. After inspection, a canvas covering was placed over the top of the trailer and a seal of some sort was placed in position so that further inspection was impossible without breaking the seal. The trailer was then hauled to the Novick Terminal at Winchester, Virginia, where it was picked up by Dyke with his tractor on the night of November 20 for transportation to its ultimate destination.

The tractor, which was described as a "cab-over-engine" type, provided the motive power and was attached to the trailer by an appropriate coupling device, leaving a space between the front end or wall of the trailer and the rear of the driver's cab of the tractor. The brakes on both the tractor and trailer were operated and controlled from the tractor cab.

The evidence is conflicting as to some of the circumstances of the accident. It was testified that Dyke, driving in the slow lane, suddenly attempted to avoid a collision with some object (almost indiscernible but apparently the Gallagher tractor-trailer) in the same lane, applied

the full power of his tractor and trailer brakes and swerved to his left. It is clear that the load of steel rods went hurtling through the front end of the trailer and through the tractor cab, carrying Dyke and the cab with it. Dyke, portions of the cab and the steel rods were thrown to the fast lane of the highway some thirty or forty feet ahead of the Dyke tractor and alongside the Gallagher tractor-trailer outfit in and on the slow lane of the highway. Following the accident, Dyke was hospitalized and his left leg was amputated below the knee. The evidence was conflicting as to whether, at the time of the accident, the Gallagher tractor-trailer was moving or stationary, whether its lights were on or off, and whether there was a collision between the front of the Dyke tractor and the rear of the Gallagher trailer.

On January 2, 1957, Dyke brought action in the U. S. District Court for the District of Maryland against Gallagher, Sechrist and Miller. He alleged that his injuries were due to negligence in that the Gallagher tractor-trailer, with which his tractor collided, was standing on the highway, without lights, in the dark hours of the early morning. Gallagher attempted to implead Novick as a third-party defendant on the ground that the accident was due, in part, to the negligence of Novick in loading its trailer in such manner that the trailer's cargo of steel shifted its weight and penetrated the cab of the tractor, thus contributing to Dyke's injuries. The trial court de-

nied the right to implead Novick but without prejudice to Gallagher's right to later seek contribution. Gallagher appealed to this court but the appeal was dismissed as premature. Sechrist v. Dyke, 4 Cir., 1958, 256 F.2d 881.

Thereafter, New Amsterdam, Gallagher's liability insurer, settled with Dyke for $43,000, took from Dyke a release which forever released Gallagher, Sechrist, Miller, Novick "and any and all other persons, firms and corporations who may be joint tort feasors" from claims for damages growing out of the accident, and brought this action for contribution against Novick as a joint tort-feasor under the Uniform Contribution among Tort-Feasors Act, Art. 50, §§ 16–24, Annotated Code of Maryland (1957 Edition), and particularly Section 17 thereof.[1]

New Amsterdam's complaint contains two counts. The first alleges that Dyke's injuries were caused in part by the negligence of Sechrist in stopping the Gallagher trailer on the highway without lights, and in part by the negligence of Novick in failing to provide protection against shifting of the cargo of steel "rails" carried in the Novick trailer, as required by Sec. 193.85 of the Interstate Commerce Commission Regulations (49 C. F. R. 193.85)[2] applicable to motor carriers. In this count it was charged that, under said regulation, Novick was required, "in the carriage of cargo such as steel rails, which would be likely to pene-

1. "§ 17. Right of contribution.

"(a) *Right exists.*—The right of contribution exists among joint tort-feasors.

"(b) *Discharge of liability or payment of share.* A joint tort-feasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof.

"(c) *When joint tort-feasor enters into settlement.* A joint tort-feasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tort-feasor whose liability to the injured person is not extinguished by the settlement."

2. § 193.85 *Protection against shifting cargo.* Every motor vehicle carrying cargo such as beams, pipes, sheet steel, and heavy rolls, the nature of which is such that the shifting thereof due to rapid deceleration or accident would be likely to result in penetration or crushing of the driver's compartment must, in addition to having the load securely fastened or braced, be provided with header boards or similar devices of sufficient strength to prevent such shifting and penetration. All motor vehicles shall be so constructed or be equipped with adequate cargo fastening devices so that the load will not penetrate the cargo compartment wall when subjected to the maximum braking deceleration of which the vehicle is capable.

trate or crush the driver's compartment upon rapid deceleration or accident, to have the load securely fastened or braced and to provide the trailer involved with header boards or similar devices of sufficient strength to prevent such shifting and penetration by the cargo."

The second count alleges substantially the same facts except that Novick's negligence is asserted by way of breach of Novick's common law duty of due care toward Dyke to load the cargo in a safe and secure manner and, "in addition, Defendant [Novick] owed Dyke the duty to construct or equip said trailer with adequate cargo fastening devices, so that the load would not penetrate the cargo compartment wall when subjected to maximum braking deceleration of which the vehicle is capable."

Both counts allege that, when Dyke applied his brakes, the steel rails penetrated the trailer wall, penetrated, crushed and carried away the driver's compartment (and Dyke himself), depriving him of all control of the tractor-trailer; and that the shifting of the cargo "immediately upon the application of his brakes" caused Dyke to lose control, which loss of control "contributed to the happening of said accident". There is no direct and affirmative allegation in either count that there was a collision between Dyke's tractor and the Gallagher trailer, although there is a recital in each count that Dyke, in his earlier action against Sechrist, Miller and Gallagher, alleged such a collision.

■ The regulation (49 C. F. R. 193.-85) mentioned in the first count, and upon which New Amsterdam greatly relies, was issued by the Interstate Commerce Commission pursuant to authority granted to it by 49 U.S.C.A. § 304 and is one of a series of regulations pertaining to the transportation by motor carriers of goods in interstate commerce. These regulations have been in effect since June 1, 1952, and must be complied with by all motor carriers (49 C.F.R. 193.1). Having been made in pursuance of constitutional statutory authority, they have the same force as though prescribed in terms by the statute. Atchison, T. & S. F. R. Co. v. Scarlett, 1937, 300 U.S. 471–474, 57 S.Ct. 541, 81 L.Ed. 748; Interstate Motor Lines, Inc. v. Great Western Ry. Co., 10 Cir., 1947, 161 F.2d 968.

New Amsterdam offered in evidence the regulation here involved and the trial judge, after first expressing some doubt as to its admissibility and after some delay, permitted it to be introduced before the jury. There was evidence that, at the time of the accident, the Gallagher tractor-trailer was standing in the slow lane of the highway, without lights, and that the tractor driven by Dyke collided with the rear of the Gallagher trailer immediately before the load of steel rods crashed from the Novick trailer, through the tractor cab and onto the highway. Sechrist testified that the Gallagher tractor-trailer outfit, which he was driving, was in motion at the time of the accident and that there was no collision, although the testimony of other apparently disinterested witnesses tended to contradict him and to corroborate other testimony as to collision. Sechrist testified also that, following the accident, he examined the roadway and the interior of the Novick trailer and found no "header boards" and no "chains and binders" which are generally used to prevent shifting of heavy loads. However, in a pre-trial deposition, it appeared that he did not mention header boards, stating that he was looking for chains and binders which he did not find.

Witnesses presented by Novick testified in great detail as to the usual and customary method, over a period of some twenty years, of loading steel bars in trailers at the Cumberland Steel Company plant and the precautions taken to prevent shifting. It was explained that chains and binders were not and could not be used to hold the load in place because such use would result in great damage to the delicate surfaces of the steel rods. A witness, who had direct personal charge of the loading of trailers at the Cumberland Steel plant, testified as to

920

the details of the loading operation. Each steel bar has a very sharp tip at each end, shaped somewhat like the sharp end of a lead pencil, which is forced and driven into header boards or bulkheads at both the front and rear of the trailer. These header boards are four inches thick, about eight or ten inches high as they run across the back and front of the trailer, and extend above the top of the loaded steel. These boards or bulkheads at the rear of the steel (the rods being shorter than the length of the trailer) are wedged in place by pieces of timber against other bulkheads placed against the rear of the trailer so that there is no "play" in the cargo. All the bulkheads are fastened to the floor of the trailer with heavy spikes. Cumberland Steel ships its steel by a great many carriers, always using the same loading procedure. In no case, it was testified, had inspection by Novick revealed any impropriety in the loading. An employee of Novick testified that he had been checking trucks loaded by Cumberland for sixteen years and had never found one improperly loaded; that he checked the Novick trailer here involved and found that the loading complied with customary requirements, all the front and rear bulkheads being in place and the steel rods properly secured thereto. There was testimony that, "when that bulkhead is in the front of the trailer, and the other bulkhead is in the rear of the trailer, that steel will not move, unless they have a terrific jar"; also that "when you run up against a wall, something has got to happen".

The trial judge submitted the case to the jury on three issues which, together with the answers of the jury, follow: (1) Was the injury to Dyke caused proximately, in whole or in part, by the Gallagher tractor-trailer driven by Sechrist? Answer, "Yes". (2) Was the injury to Dyke caused proximately in part by his own contributory negligence in the operation of the tractor-trailer he was driving? Answer, "No". (3) Was the injury to Dyke caused proximately, in whole or in part, by negligence

on the part of Novick in failing to properly secure the steel in the Novick trailer? Answer, "No".

New Amsterdam charges error by the trial court in refusing to instruct the jury as requested and in charging the jury as it did with respect to the I. C. C. Regulation mentioned in the first count. The requested and refused instruction was as follows:

"That if the jury shall find that Defendant failed to fasten or brace its load of steel rods or to provide header boards or similar devices to prevent said steel rods from shifting upon rapid deceleration or accident; and if the jury shall further find that as a result thereof, said steel rods shifted and penetrated or crushed the driver's compartment in Defendant's tractor; and if the jury shall further find that this resulted in injury to the driver of Defendant's tractor of a kind which the duty so to secure said steel rods was designed to protect the driver of said tractor against, then Defendant's failure so to secure said steel rods may be regarded as a substantial factor in the injuring of said driver, even though said driver might have been injured if Defendant had not failed to secure said steel rods, and that in order to prevent Defendant's failure to secure said steel rods from being a substantial factor, it must clearly appear that securing the said steel rods would have been unavailing or that the driver's injury would have been sustained even if Novick had not failed to secure said steel rods. The Court further instructs the jury that the burden of proving that the securing of said steel rods would have been unavailing or that the driver's injury would have been sustained even if Defendant had not failed to secure said steel rods, is upon the Defendant."

The court instructed the jury that, in answering the third issue, it was to consider whether Novick was negligent and, if so, whether such negligence was

the proximate cause of Dyke's injury. In this connection the court read the I. C. C. Regulation to the jury as an explanation "as to what is the duty of an interstate carrier by motor of goods to be transported". In addition, the court charged the jury at length as to the common law duty of Novick to Dyke to exercise due care in seeing to it that Dyke was not exposed to undue danger by the loading by the carrier. The jury was told that the fact that the cargo came out of the trailer in the course of the accident was evidence of improper loading, but was not conclusive on the point and that the pivotal and ultimate question for determination is, "Was the steel properly secured, or packed, or crated in the Novick trailer by the Novick Company?" The court told the jury:

"Now, on this, one further thing that I should tell you about—the requirement of carefulness in the securing of steel by Novick. The regulation of the Interstate Commerce Commission does not constitute the motor carrier, the subject of the regulation, an insurer of safety, but what is required is that the carrier must exercise all reasonable care in securing the load. The objective, of course, is to have the load properly secured, so that it will not do any harm to anybody or anything; but, in securing the load, there is not the imperative requirement of liability in the event of any accident that may have occurred. What the regulation requires is that at least reasonable care must be affirmatively exercised in securing a load. It does not mean that in every event, if an accident happens, the motor carrier is responsible, if it is found that the load has in fact shifted, but must depend on the nature of the accident as to just what did occur; and a tractor-trailer, of course, may be overturned by a collision, in which event, possibly any of its contents would be spilled out on the highway. But the requirement of care on the part of the defendant, or the trailer operator, is that he should exercise care in complying with the regulation."

Certain excerpts from the court's charge, asserted by New Amsterdam as error, are set forth below.[3]

3. "The plaintiff, here, the Amsterdam Casualty Company, in the suit for the Gallagher Co., says, 'If we were liable, then the Novick Company was also liable, in part, at least, and should at least contribute a half of our loss.' And *the basis for the claim*, in this case, *is some charge that Novick Co. did not properly secure the steel in the trailer.*

"Now, the *pivotal question* in this case, that is to say, the *ultimate question* that you are being asked, is *not whether the steel came out as a result of the very strong application of the brakes, or by reason of the collision*—to the extent there was one—of the two vehicles; but *the question*, then, is, 'Was the steel properly secured, or packed, or crated in* the Novick trailer by the Novick Company?'

\*   \*   \*   \*   \*

" \* \* \* Until you hear from the other side, you may infer that there was something lacking in the loading or securing of the steel, and you find that it all fell out of the trailer. But *the fact that it fell out*, while that *is a matter which you can consider in relation to whether there was any that fell out because of the improper loading*, or not, *is not the final question, which is, 'Was it properly stowed in the first place?'*

\*   \*   \*   \*   \*

"Now, there is also what I would consider a most important duty. Where the relationship between Dyke and the Novick Co. was such as we have here, there would be a common law duty to see that he was not intentionally subjected to undue dangers; but, nevertheless, *I again specially call to your attention that the question here is not merely whether the load did come loose and break through the walls of the trailer, but first, what caused it to do that?*

"So far as this case is concerned, if you get to answering this third question, *so far as the liability of Novick in this case is concerned, the question is not whether the load came loose and hurt Dyke, but whether it was caused to come loose and hurt Dyke*, proximately *by virtue of the negligence of the Novick people in loading the trailer.*

The question presented on appeal is stated in New Amsterdam's brief as follows:

"Did the undisputed violation of Section 193.85 of the I. C. C. Regulations by Novick Transfer, in and of itself, give rise to a cause of action by Dyke against Novick Transfer, if said violation were shown to have proximately contributed to the accident and to the resulting injuries to Dyke?"

We have found it exceedingly difficult to follow counsel's brief and argument and to pinpoint the real basis of his charges of error. In stating the question for determination, counsel refers to "the undisputed violation" of the regulation and later in his brief mentions the "admitted" violation. He seems to argue that: (a) There was an "admitted" violation of the regulation; (b) even if Novick did not admit violating the regulation, such violation is conclusively established as a matter of law by the mere fact that the steel came out of the Novick trailer in the course of the accident; (c) such violation of the regulation, even though Novick may have used all reasonable care in loading the steel, is negligence as a matter of law; and (d) it was error to submit to the jury the question of negligence as to loading the Novick trailer; the trial court should have instructed the jury that the violation of the regulation was negligence and should have restricted the jury to the determination of the single question

of whether such violation was the proximate cause of the accident.

In the court below, New Amsterdam conceded that the I. C. C. Regulation did not make Novick an insurer of safety and, in its brief here, states that "in excepting to the lower Court's charge, Appellant's counsel conceded that the violation of this regulation was not negligence per se". We have not found, nor has counsel pointed out, anything in the record to support a claim that violation of the regulation was "admitted". Asserted as establishing proof of violation are Sechrist's testimony that he found no header boards or chains and binders after the accident and the mere fact that the cargo of steel shifted, penetrating the trailer and cab. But there was evidence before the jury from which it could have found that the shifting of the cargo and penetration of the trailer and cab were not due, as charged in both counts, to maximum braking deceleration but to the impact of a collision with the tremendously heavy Gallagher trailer carrying sheet steel, imparting momentum to 16½ tons of greased steel rods. The jury may well have disbelieved Sechrist in view of the several contradictions of his testimony on material points by witnesses who were apparently disinterested. There was detailed evidence as to the manner in which the steel in the Novick trailer was fastened by the use of bulkheads or header boards and braces, a loading procedure which had been found to be adequate, efficacious,

Now, *that is the question which you must ask yourselves* when you get to this third question in the case.

    *      \*      \*      \*      \**

"What is the evidence in the case to show that the load was not properly secured? You have the fact, which is not disputed, that the load of steel was scattered along the highway, at or near the point of collision. *That, however, does not answer the question of whether it was improperly loaded or not. Therefore, as I say,* the question is not whether the Steel Company was responsible, but whether Novick is the one who was responsible; and there, of course, *you*

have to look at the evidence as to how it was loaded and how it was inspected, on the part of Gallagher; and you have evidence on both points rather fully in the case.

    \*      \*      \*      \*      \*

" * * * The burden of proof is on the plaintiff in this case, with regard *to the whole case, to satisfy you* by the preponderance of the evidence *that* the *Novick Company was negligent* in *not properly securing the steel in the truck,* and that *that was the proximate cause,* or one of the proximate causes of the loss." (Emphasis by New Amsterdam).

and satisfactory over a long period of years and free from criticism or suggestion of I. C. C. representatives. So we cannot adopt the premise that a violation of the regulation was either undisputed or admitted. On the contrary, the charge of violation is vigorously challenged.

■ The regulation here in question is quite general in nature. Except for the direction that header boards be used it does not, as in the case of certain provisions of the Federal Safety Appliance Act, 45 U.S.C.A. § 1 et seq., require any specific devices of any particular design or measure of strength. It cautions against certain types of possible injury and requires that "adequate" measures be taken to guard against certain contingencies. Certainly New Amsterdam must accept this view, consistent with its concession that the regulation does not make the carrier *an insurer of safety.*

■ If New Amsterdam is correct in its argument that the regulation must be so interpreted that Novick is guilty of a violation thereof as a matter of law merely because the steel came out of its trailer, the jury, under the controlling Maryland law, should still pass on the question of whether that violation constitutes negligence. Even where the claim of liability for negligence is founded upon a violation of a penal statute, the Maryland rule seems to be that ordinarily the jury must determine not only whether the violation of the statute is the proximate cause of the injury but also whether it constitutes negligence.

The Court of Appeals of Maryland has followed the rule that violation of a penal statute is not "negligence per se" (a principle admitted and conceded by New

Amsterdam) but is merely "evidence of negligence" for the jury. The distinction was noted in Kelly v. Huber Baking Co., 1923, 145 Md. 321, 125 A. 782. In passing upon the effect of a violation of a provision of the Motor Vehicle Act, 145 Md. at page 334, 125 A. at page 787, the court said:

"While it has been generally held that a violation of such a statute may create a *prima facie* presumption of negligence, it has never been held in this State to be negligence *per se.*"

At page 335 of 145 Md., at page 788 of 125 A., the court further stated:

"The distinction between mere 'evidence of negligence' and 'negligence *per se*' is very marked, in that in the former there must be an adjudication as to whether or not the violation constitutes negligence, whereas in the latter negligence necessarily follows the proof of the violation. * * *"

The Maryland Court pointed out that where the "evidence of negligence" rule applies, one who has violated a statute is given the opportunity to rebut the inference of negligence that arises against him from such a violation. See also cases noted below.[4]

Notwithstanding decisions of the Court of Appeals of Maryland that the violation of a penal statute is not negligence per se, but is only prima facie evidence of negligence, New Amsterdam places great emphasis on language in some of the Maryland cases incorporated in Poretsky & Sons, Inc. v. Hurwitz, 4 Cir., 1956, 235 F.2d 295. There the plaintiff, an invitee, was injured because of the defendant's failure to comply with

4. Brown v. Bendix, 1946, 187 Md. 613, 619, 51 A.2d 292, 294 (failure of driver to obey statutory duty to allow right of way to pedestrian "is at least some evidence of negligence") ; Meese v. Goodman, 1934, 167 Md. 658, 664, 176 A. 621, 623, 98 A.L.R. 480 (the mere violation of statute not "evidence of negligence" unless proximate cause of accident) ; State, Use of Schiller v. Hecht Co., 1933, 165 Md. 415, 420, 169 A. 311, 313 (directed verdict for defendant reversed because "the failure to observe the provisions of the ordinance in regard to safety locks [on elevator doors] was prima facie evidence of negligence, if it resulted in injury to one who was rightfully on the premises") ; State to Use of Potter v. Longeley, 1932, 161 Md. 563, 570, 158 A. 6, 8 (effect of violation of statute is "only to raise a presumption of negligence in favor of one entitled to assert it").

a building regulation fixing minimum head room in a dwelling. The recovery was permitted below and the lower court was affirmed. In this connection this court held (page 297):

"There is no doubt that the plaintiff was entitled to the protection with which the law surrounds an invitee since the houses were open for inspection and sale and the public was invited to visit them. Whether the Poretsky Company was guilty of negligence in this case must be considered in the light of the violation of the Building Code, of which *the company was guilty. As to this feature the law of Maryland is well settled. The mere violation of a statute or ordinance does not of itself support an action for damages, but if such a violation is the proximate cause of injury a right of action does accrue to the injured party.* Gosnell v. Baltimore & O. R. Co., 189 Md. 677, 687, 57 A.2d 322; Hopper, McGaw & Co. v. Kelly, 145 Md. 161, 169, 125 A. 779." (Emphasis supplied).

See also Cumberland & Westernport Transit Co. v. Metz, 1930, 158 Md. 424, 149 A. 4, 565. In Gosnell v. Baltimore & Ohio Railroad Company, cited supra in the Poretsky case, there were no safety gates at a railroad crossing although required by statute. The court said: [189 Md. 677, 57 A.2d 327] "In view of the fact that there were no safety gates, we must determine whether there was not sufficient evidence that the lack of warning to the appellant [plaintiff] was the proximate cause of the accident to justify submission of the case to the jury." In other cases cited, the court was simply stating generally that there was no liability unless the act constituting violation of law was the proximate cause of injury, but did not hold that if there was a violation of law which was the proximate cause of injury, the plaintiff would necessarily recover without regard to whether the jury believed the violation was negligence.

New Amsterdam cites Interstate Motor Lines, Inc. v. Great Western Ry. Co., 10 Cir., 1947, 161 F.2d 968. The decision affirmed the admissibility of an I. C. C. Motor Safety Regulation where the jury had found for the plaintiff. But the court said (page 970): "Under the law of Colorado, the failure of a truck engaged in commercial operation on the highway to comply with a governing statute or municipal ordinance reasonably intended to protect and safeguard the public constitutes negligence, and damages may be recovered if the negligence was the efficient cause of injury." In other words, under Colorado law, such violation was negligence per se but recovery may be had only if the violation was the proximate cause of injury. We are here dealing with the laws of Maryland, not Colorado.

New Amsterdam cites also two cases to support its assertion that *this* court "has on two occasions recognized that the violation of the regulations promulgated by the Interstate Commerce Commission * * * would give rise to a cause of action", but it is our opinion that the holdings in these cases, hereinafter discussed, are not helpful to New Amsterdam.

In the first of these cases, United States v. Savage Truck Line, 4 Cir., 1953, 209 F.2d 442, 44 A.L.R.2d 984, the court, speaking through Judge Soper, held that as between shipper and carrier, the primary duty under the I. C. C. regulations respecting safe loading is on the carrier, and where the carrier knowingly permits a vehicle to be driven where it has been loaded in a dangerous manner by the shipper, the carrier must indemnify the shipper against liability for loss or injury to a third person; that despite the language of the regulation regarding security of loading, the shipper would be responsible, rather than the carrier, where the defects are latent and concealed and cannot be discerned by ordinary observation by carrier's agent. While alleged violations of regulations were involved, the court noted that there

were findings as to negligence as evidenced the following quotation on page 446:

> "In the pending case the judge found that the employees of the United States who loaded the truck were guilty of negligence in failing to use ordinary care to secure the engines properly and that the employees of Savage failed to exercise ordinary care in accepting the cargo in the manner in which it was loaded on the truck. He also found that the driver of the truck failed to exercise ordinary care in its operation, having knowledge of the nature of the cargo and the method of its loading and securing. The evidence supports these findings. * * *"

The second of these cited cases, General Electric Company v. Moretz, 4 Cir., 1959, 270 F.2d 780, involves electrical control panels which all parties conceded were loaded on a motor trailer in a manner leaving open spaces without bracing, allowing the cargo to shift in the course of transportation. The driver, who was injured when the cargo shifted, sued General Electric, the shipper which had loaded the trailer. General Electric contended that the driver was guilty of contributory negligence because I. C. C. Regulation, 49 C.F.R. 193.9(b), provided that no motor vehicle should be driven unless the driver thereof should have satisfied himself that all means of fastening the load were securely in place. The plaintiff driver made an inspection of the tires, lights, doors and exterior fastenings, but did not inspect the interior because the load was sealed when delivered to him and he had no authority to break the seal. General Electric (as New Amsterdam here) contended, in requesting a directed verdict in its favor, that the failure of the driver to comply with the regulation constituted negligence as a matter of law. This court, again speaking through Judge Soper, rejected this contention and held that,

under the circumstances, the driver was not required to break the seal and (at page 785) "[T]here was evidence from which the jury might find that it was not unreasonable on his part to infer from the sealing of the doors of the truck that the load had been properly secured by the agents of the carrier and thus satisfy himself that the cargo was ready for carriage over the public highway."

■■ In our opinion, the refusal of the trial court to grant New Amsterdam's requested instruction was not error. The court was not required to use any particular form of words in delivering its charge and if the charge, taken as a whole, fairly presented the case to the jury, New Amsterdam cannot complain of the trial court's failure to adopt language particularly suggested. In fact, New Amsterdam does not argue that the refusal of the request was erroneous except for the same reasons assigned as error in the trial court's presentation of the case to the jury. Moreover, the request was confusing in that it was phrased in terms of "substantial factor" and was not clearly framed with reference to the basic questions of negligence and causation. Finally, the very form of the requested instruction would, in our opinion, have been most confusing to the jury and the request did not clearly and effectively set forth New Amsterdam's own theory of the case. In addition to charging the jury as to the common law duty of Novick to Dyke, consistent with the theory of the second count, the court, in effect, told the jury to determine (a) whether there was a violation of the pertinent regulation; (b) if so, was the violation negligence; and (c) was such negligence the proximate cause of the accident. Concluding, as we do, that there was no error in the court's charge, and that the issues were fairly and properly submitted to the jury, the judgment below will be affirmed.

Affirmed.