Judith Karen **BETESH, Individually and as Administratrix of the Estate of Stanley Leon Betesh, Deceased, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 1022-66.**

United States District Court, District of Columbia.

Aug. 19, 1974.

Jules Fink and Isadore B. Katz, Washington, D. C., for plaintiffs.

Eric Marcy and Peter Schaumber, Asst. U. S. Attys., for the District of Columbia, Washington, D. C., for defendant.

## MEMORANDUM OPINION

BRYANT, District Judge.

 This is an action for malpractice brought against the United States by the widow-executrix and parents of the decedent, Stanley Leon Betesh, under the Maryland survival statute, Md.Code, Art. 75, § 15B, and Md.Code, Art. 93, § 7–401(n) (1957), and the Maryland wrongful death statute, Md.Code, Art. 67, § 1 et seq.[1] Jurisdiction is vested in this court by the Federal Tort Claims Act, 28 U.S.C. § 1346(b).[2]

On April 22, 1964, Stanley Leon Betesh, then 20 years old, reported as ordered to the Armed Forces Examination Station (AFES) at Fort Holabird, Maryland, for a pre-induction physical examination. Mr. Betesh took with him a note from an orthopedic surgeon stating that Mr. Betesh had a knee injury and should not engage in vigorous athletics or similar activities.

As part of the pre-induction physical, a 70mm x-ray was taken of Mr. Betesh's chest. A radiologist under contract with the Selective Service System read this x-ray, judged it to be abnormal, and ordered that an enlargement be made. The next day a second radiologist under contract with the Selective Service System read the enlarged x-ray. This doctor, also, observed that it was abnormal and prepared a report which stated—

> The left hilum is slightly enlarged as to the upper mediastinum. This may be of no significance, but it is not possible to rule out sarcoid, tuberculosis adeniter, or lymphoma.

This report was never shown to Mr. Betesh, nor was he otherwise informed of his abnormal x-ray. Before Mr. Betesh left Fort Holabird on April 22, he was interviewed by Dr. Vernon M. Gelhaus, a physician under contract with the Selective Service System, who discussed test results with him. The x-ray results were not available at the time of this interview. Dr. Gelhaus testified that he did not tell Mr. Betesh that he was acceptable for induction despite his knee problem.

Because of his abnormal x-ray, Mr. Betesh was rejected. A Statement of Acceptability (DD Form 62—*Registrant's Copy*) was sent to him by the Fort Holabird AFES Administrative Section notifying him of his rejection, but not revealing the explanation for it. In accordance with the standard practice of the Selective Service System, the "remarks" section of the form had been deliberately blotted out on the Registrant's Copy. On the Local Board Copy, sent to Mr. Betesh's local draft board but not to him, the remarks section is unobscured and reads—

> Remarks (These to be directed to Local Board only) Physically disqualified—Abnormal x-ray. Re-examination believed justified in 3 months.

Unable to read the obscured section, Mr. Betesh believed that his rejection was due to his knee problem.

---

1. Under the provisions of the Federal Tort Claims Act, 28 U.S.C. § 1346(b), the law of the place where the alleged negligence occurred—in this case, Maryland—is the law to be applied. Since the acts and omissions complained of occurred in April 1964 and shortly thereafter, the Maryland Code provisions of that time apply.

2. The government argues that failure of its physicians to inform Mr. Betesh of his abnormal x-ray falls under the misrepresentation exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(h). This argument is without merit. The gravamen of the action is not misrepresentation, but rather negligent performance of operational duties. *United States v. Neustadt*, 366 U.S. 696, 711 n. 26, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961) ; *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) ; *Ingham v. Eastern Air Lines*, 373 F.2d 227, 238–39 (2nd Cir. 1967) cert. den. 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967) ; *United Air Lines, Inc. v. Wiener*, 335 F.2d 379, 398 (9th Cir. 1964) cert. dismissed 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964) ; *Wenninger v. United States*, 234 F.Supp. 499 (D.Del.1964) aff'd 352 F.2d 523 (3d Cir. 1965).

In early October, Mr. Betesh was ordered to report once more to Fort Holabird. Dr. David R. Boyd, of the AFES, testified that Mr. Betesh was summoned to Fort Holabird to see whether his condition has progressed and to advise him accordingly, rather than to determine his eligibility for induction into the Army.

On October 26, Mr. Betesh reported to Fort Holabird. While waiting there with his medical file, he saw a written reference to the abnormal x-ray, learning of it for the first time. The next day he went to his family doctor, who immediately referred him to a diagnostic radiologist. On October 28 he entered Holy Cross Hospital for a biopsy and other diagnostic testing. On October 29 his condition was diagnosed as Hodgkins disease (cancer of the lymph glands) of the nodular sclerosing type, and he was referred to a therapeutic radiologist for deep x-ray therapy. Treatment was begun November 5, about one week after Mr. Betesh learned of his abnormal x-ray.

When the Selective Service System physicians first observed Mr. Betesh's chest x-ray in April 1964, the abnormal mass was relatively small; by October 1964, the mass had grown more than 6-fold and covered an area that extended to the left chest wall. The delay from April to October in seeking treatment was of critical importance. Tumor size and number of bodily areas affected are major factors in the treatment of Hodgkins disease. There is a 95–99% success rate for nodular sclerosing Hodgkins disease if treatment is begun in a stage as early as Mr. Betesh's disease appeared to be in April 1964.[3] By late Oc-

tober, however, his disease had progressed to such an extent that cure was not possible. Testimony was unanimous that good medical practice requires that a doctor warn a person with an x-ray such as Mr. Betesh's April x-ray of its potential significance, and that six months is too long to wait before giving such a warning. One doctor felt that a physician, upon seeing such an x-ray, should advise his patient to seek further medical evaluation "yesterday."[4]

The promptness with which Mr. Betesh sought treatment when he was finally told of his condition leads the court to conclude that he would have acted just as promptly six months earlier, if the government had told him at that time of his abnormal x-ray. Had Mr. Betesh been treated in late April or early May 1964, he would have had a normal life expectancy.[5]

From November 5, 1964, to February 15, 1965, Mr. Betesh received 50 treatments of deep x-ray therapy at the Washington Hospital Center, a standard and appropriate course of therapy for this disease at this stage. From March 1965 to June 1965, Mr. Betesh's disease was in remission. Thereafter, he began to experience pain in the left anterior rib margin area. He was referred by one of his physicians to the National Institutes of Health (NIH) in January 1966 and was treated radiologically and chemically there from January 17, 1966, until his death.

During the time he was being treated at NIH, Mr. Betesh was able to lead a normal life in certain respects. He married plaintiff Judith (Betesh) Sher in August 1967. While there is evidence on both sides, we find that Judith (Be-

---

3. Specialists in Hodgkins disease describe the extent of the disease by placing it in one of four categories, ranging from stage one, with high expectance of cure, to stage four, with virtually no such expectancy. Staging of a patient is frequently a matter of judgment, and competent physicians may reach different conclusions. While there were some differences of medical opinion at trial, the court finds, based on a preponderance of

the evidence, that Mr. Betesh's disease was in stage one in April 1964.

4. Testimony of H. Edmund Levin, diagnostic radiologist.

5. The state of medical research on the question of survival does not enable physicians to state with certainty the life expectancy of those who recover from Hodgkins disease. Present indications are, however, that they have a normal life expectancy.

tesh) Sher was unaware of the seriousness of Mr. Betesh's disease prior to their marriage. He also worked, when physically able to do so, for his father. With increasing frequency throughout this period, however, Mr. Betesh suffered pain and weakness, severe nausea and vomiting from treatment of his disease, and severe mental suffering and anguish.

When he died, Mr. Betesh was 26 years old. Had he been healthy, his life expectancy would have been an additional 45.5 years. He was a high school dropout, 1½ credits short of graduation. On the basis of a projected retirement age of 62, Mr. Betesh's future working life would have been 35.5 years.

 In order to recover in this negligence action, plaintiffs must show that a duty was owed to decedent by the United States, that the duty was breached, and that breach of this duty was the proximate cause of the injuries sustained.[6] *Walter Brooks Bradley, Inc. v. N. H. Yates & Co.*, 218 Md. 263, 268, 146 A.2d 433, 436 (1958).

Defendant does not dispute that it owed Mr. Betesh a duty of care. The Government insists that its duty was limited to the hiring of qualified personnel and their non-negligent performance of the examination; plaintiffs argue that the duty extended to warning Mr. Betesh of known dangers to his health. The Government's liability hinges, therefore, on whether the duty its physicians owed Mr. Betesh required that they tell him of his abnormal x-ray. If such a standard of care is established, the facts clearly indicate that it was breached and that the breach led proximately to Mr. Betesh's death.

Plaintiffs maintain that the Government's duty to inform Mr. Betesh arises both from the Government's own regulations and from the common law. Each theory of recovery is discussed below.

*Federal Regulations as a basis for the standard of care*

 Under Maryland law, a Federal regulation presumptively establishes a standard of care, if the regulation was designed to protect a class of persons that includes the plaintiff against the kind of injury that proximately occurred from its violation. As a corollary, violation of such a regulation establishes a presumption of breach of duty. *New Amsterdam Casualty Co. v. Novick Transfer Co.*, 274 F.2d 916 (4th Cir. 1960); cf., *Aravanis v. Eisenberg*, 237 Md. 242, 206 A.2d 148 (1965); *Alston v. Forsythe*, 226 Md. 121, 172 A.2d 474 (1961); *State v. Hecht Co.*, 165 Md. 415, 169 A. 311 (1933); *State v. Longeley*, 161 Md. 563, 158 A. 6 (1932).

Since at least 1940, Federal regulations have directed Selective Service examining physicians to advise rejected examinees who need medical attention to seek advice from a doctor.[7] The regulation in effect at the time relevant to this case was Army Regulation 601–270, Par. 64f, Change 5, Sept. 12, 1962 (referred to hereinafter as "Paragraph 64f" or "the regulation"), which provided as follows:

> *Rejected examinees in need of medical attention.* Applicants for enlistment and registrants who are considered to be medically unfit for military service and who have been determined to have a condition requiring medical attention will be advised by the medical examiner to seek advice from a physician. An entry will be made in item 75, Standard Form 88, reflecting the fact that notification was made . . .

---

6. Defendant contends that Mr. Betesh was contributorily negligent in not calling his draft board to find out why he was rejected. The court finds, however, that a reasonable person in the circumstances of this case would conclude, as Mr. Betesh did, that his bad knee kept him from passing the examination and that there was no need to call his draft board.

7. See M.R. 1–7, Sec. II, Par. g, p. 13 (Oct. 1940).

244

Defendant asserts that failure to follow the procedure set out in Paragraph 64f cannot be used to establish a presumption of breach of a standard of care because (1) the regulation does not apply to private individuals, (2) it was not promulgated to benefit a class that included Mr. Betesh, (3) it is directory, not mandatory, and (4) it applies only if the examinee is still present at the examining station. The court rejects the defendant's arguments, for reasons spelled out below, and finds for the plaintiff on this issue.

Defendant first argues that Paragraph 64f cannot be used to establish a presumption of a standard of care or breach thereof because under the Federal Tort Claims Act the Government is liable only "to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; *United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). Since no private individual is subject to Regulation 64f, the Government argues that the regulation should not apply. This argument is incorrect. Federal regulations may be introduced in suits under the Federal Tort Claims Act to impose duties and standards upon the Government. *Gill v. United States*, 429 F.2d 1072 (5th Cir. 1970); *United Air Lines, Inc. v. Wiener*, 335 F.2d 379 (9th Cir. 1964); *Thinguldstad v. United States*, 343 F.Supp. 551 (S.D.Ohio, E.D.1972). The Government might also argue that restricting liability to that incurred by "private individuals under like circumstances" precludes use of Paragraph 64f to establish a presumption of standard of care, since no such presumption arises if a private defendant fails to follow its internal regulations. This argument focuses on the one aspect of this case that differs from a case against a private defendant: the "governmental"

aspect of internal directives.[8] The court cannot, however, accept this argument. The "like circumstances" restriction does not require that every aspect of a cause of action be identical to an action between private parties. The Government's argument would make the phrase "like circumstances" equivalent to "same circumstances." The Act does not forbid the court from taking into account those aspects that are unique to governmental functions—such as the existence of governmental regulations. To interpret the Act as doing so would be contrary to its plain language and its policy of expansion of liability.

Defendant's second argument, that the regulation was not promulgated to benefit a class that included Mr. Betesh, is incorrect. There are two possible purposes for advising rejected examinees to seek medical advice—to remedy the condition so that the registrant may become acceptable to the Army or to protect the registrant's health. (A third possible purpose, to protect the public from communicable diseases, is covered in other paragraphs of the regulation.) [9] A 1965 amendment to Paragraph 64f confirms that these two purposes underlay the regulation.[10] The amendment made no change in the duties required of examining physicians, but recast the Paragraph for clarity and added language to reveal its purposes. The amended regulation states that "[If] the examinee's condition is such that remediable medical care will possibly render him fit for military service, or if such is not the case but the examinee's personal health and well-being can be improved, he will be advised to seek the services of his family physician or other health agency in his home area." Where a regulation of doubtful purpose is replaced by an amendment that clearly states its purpose, the amendment is

---

8. There is no question that internal regulations or memoranda would be admissible as evidence bearing on the standard of care. The only question is whether they establish a presumption.

9. 601–270, Sec. III, Pars. 64d and 64e.

10. Army Regulation 601–270, Chap. 3, Sec. III, Medical Examinations, Responsibilities and Processing, Par. 68h(12)(b).

entitled to great weight in determining the purpose of the prior regulation.[11] Defendant has introduced no evidence to counterbalance the weight of the clarifying amendment, and the court holds that Mr. Betesh was included in the class of persons to be protected by Paragraph 64f.

■ Defendant's third argument, that the regulation is directory and not mandatory, is unpersuasive for two reasons. First, the procedure described in the regulation is set forth in mandatory language, and defendant has not drawn the court's attention to anything in the legislative history to undercut this mandatory language. Second, defendant has given no reason why even a directory regulation might not be used to establish a presumption of duty of care.

■ Defendant's fourth argument, that Paragraph 64f applies only if the examinee is still present at the examining station, finds no support in the language of the Paragraph. Rather, it unqualifiedly states that examinees "will be advised by the medical examiner to seek advice from a physician."

■ It is clear that Mr. Betesh, as a registrant, was in the class of persons who were intended beneficiaries of Paragraph 64f and that the injury he suffered was the kind of injury that the regulation was designed to protect against. Thus, under Maryland law, this regulation establishes a presumption of a standard of care and its violation establishes a presumption of breach of duty. Defendant has not rebutted either presumption. The court holds, therefore, that Paragraph 64f establishes a duty of care toward Mr. Betesh and that the Government's failure to follow that regulation constituted a breach of that duty.

Even if the regulation were not regarded as establishing a presumption, it would, of course, still be evidence on the issues of the standard of care required of Selective Service physicians and breach of this standard. The court finds that if the regulation is regarded as ordinary evidence it preponderates over evidence introduced by defendant and supports a holding that defendant's Selective Service physicians breached a duty of care owed Mr. Betesh.

*The common law as a basis for the standard of care*

Plaintiffs assert that regardless of any applicable regulations the Government is liable for breach of a common law standard of care. Three theories must be considered: (1) Even in the absence of a doctor-patient relationship, a doctor who assumes to act must act carefully with respect to all aspects of the examination; (2) where a doctor acts primarily for the benefit of an employer in examining a prospective employee, the doctor must act carefully with respect to all aspects of the examination; (3) where a doctor-patient relationship exists, the doctor must act with care. The court holds that each of these theories supports a conclusion in favor of plaintiffs.

(1) *A doctor who assumes to act must act carefully with respect to all aspects of the examination.*

■ Under the common law of Maryland, a physician who examines a person may owe that person a duty of good medical care with respect to all aspects of the examination, even if no doctor-patient relationship exists between them. The decision of Maryland Court of Appeals in *Hoover v. Williamson*, 236 Md. 250, 203 A.2d 861 (1964) provides a clear statement of this rule. In *Hoover*,

---

11. *Red Lion Broadcasting Co. v. Federal Communications Commission*, 395 U.S. 367, 380–381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Federal Housing Administration v. Darlington, Inc.*, 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958); 1A *Sutherland Statutory Construction*, 4th ed., par. 31.06; 2A, *id.*, par. 49.11 (1972); cf., 2 *Wigmore on Evidence*, 3d ed., § 437 (1940).

plaintiff alleged that defendant physician had misdiagnosed plaintiff and misinformed him of the nature of his condition following a physical examination conducted on behalf of plaintiff's employer. Plaintiff asserted that the physician misdiagnosed plaintiff's silicosis as "a little infection," deliberately concealed a consultant's recommendations, and told plaintiff that the ailment was minor. The trial court sustained a demurrer to the complaint on the ground that it showed an absence of a doctor-patient relationship. The Maryland Court of Appeals reversed, resting its decision on

> a more fundamental rule of long standing under which a physician may incur a tort obligation which is nonconsensual and independent of contract. This is the general rule that one who assumes to act even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all. 203 A.2d at 863.

The "duty of acting carefully" was applied in *Hoover* to all aspects of the physician's work, not merely the conduct of the physical examination, and recovery was allowed on the basis of his misdiagnosis, concealment of contrary information, and misrepresentations to the examinee.

The circumstances of the present action bring it within the rule of *Hoover*. Selective Service physicians entered Mr. Betesh's life not at his request but through a command, enforceable by penal sanctions, that he appear before them. Having assumed to act, the Government physicians were under a duty to act carefully, not merely in the conduct of the examination but also in subsequent communications to the examinee.

█ It might be suggested that *Hoover* is distinguishable from the present action because in *Hoover* the examinee relied upon express misrepresentations of the physician, which led him to forego treatment. The court finds reliance present in this case also, notwithstanding the fact that it was the doctor's silence that misled the examinee. When a doctor conducts a physical examination, the examinee generally assumes that "no news is good news" and relies on the assumption that any serious condition will be revealed. *Union Carbide & Carbon Corporation v. Stapleton*, 237 F.2d 229, 232–33 (6th Cir. 1956) cited approvingly, *Canterbury v. Spence*, 150 U.S.App.D.C. 263, 464 F.2d 772, 781 n. 18 (1972) cert. den. 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). In the absence of evidence to the contrary, it is fair to infer that Mr. Betesh assumed that the silence of the examining physicians meant that the results of tests they had performed were negative. This reliance occurred at a time when prompt follow-up would have detected his malignancy.

█ Although the court finds that Mr. Betesh did rely to his detriment on the silence of the examining doctors, it does not hold that a finding of reliance is essential to the Government's liability. Nor is it certain that the Maryland Court of Appeals would hold reliance essential. No Maryland case requiring reliance has been brought to the court's attention.[12]

(2) *Where a doctor acts primarily for the benefit of an employer in examining prospective employees, the doctor must act carefully with respect to all aspects of the examination.*

█ The rule of the majority of courts that have considered the question[13] is that where a physician is

12. Dictum in *Hoover* cites approvingly Restatement of Torts, § 325, (1934), which requires that plaintiff rely on defendant's wrongful act in order to recover. However, the revised version of that section, Restatement (Second) of Torts, § 323 (1965), which was not yet published when *Hoover* was decided, does not require reliance.

13. *De Zon v. Amer. President Lines.* 318 U.S. 660, 668, 63 S.Ct. 814, 87 L.Ed. 1065 (1943); *Coffee v. McDonnell-Douglas Cor-*

an employer's agent and acts primarily to protect the employer's interests the physician must conduct all aspects of the examination with care, and if he fails to do so the employer is liable for injuries inflicted. That the injured party is a prospective rather than an actual employee has been held not to affect the operation of this rule. *Coffee v. McDonnell-Douglas Corporation*, 8 Cal.3d 551, 105 Cal.Rptr. 358, 503 P.2d 1366 (1972); *Rannard v. Lockheed Aircraft Corporation*, 26 Cal.2d 149, 157 P.2d 1 (1945).

The rule has strong equitable appeal. It is, after all, at the employer's direction and for the employer's benefit that the doctor is in a position to affect individual and public health. When the examinee is faced with examination against his will, as in the present case, the equity is even stronger.

(3) *Where a doctor-patient relationship exists, the doctor must act with care.*

 Plaintiff's third common law theory is that the Government doctors acted in a way that created a doctor-patient relationship and thereby imposed upon themselves the duty to act carefully.

Plaintiffs point to the testimony of Dr. David R. Boyd, Chief of the Fort Holabird AFES, to support their argument. Dr. Boyd testified that Mr. Betesh was recalled to see whether his condition had progressed and to advise him accordingly, rather than to assess his fitness to serve in the Army. Plaintiffs argue that by assuming these diagnostic and advisory duties the doctors cast themselves in the role of treating physicians and created a doctor-patient relationship. It is reasonable to infer that since Mr. Betesh was recalled for his benefit alone in October, it was also his

benefit alone that was contemplated in April when the remark, "Re-examination believed justified in 3 months" was entered on the Statement of Acceptability, DD Form 62. The court finds this line of reasoning persuasive and concludes that the physicians at Fort Holabird did in fact take upon themselves the role of treating physicians in April 1964 and thus established a doctor-patient relationship with Mr. Betesh.

 Under the common law of Maryland, establishment of a doctor-patient relationship imposes upon the doctor the duty to exercise the amount of care, skill, and diligence exercised generally in the community by doctors engaged in the same field. *State v. Fishel*, 228 Md. 189, 179 A.2d 349 (1962). Applied to the facts of this case, this standard means that a physician undertaking a physical examination has a duty to disclose what he had found and to warn the examinee of any finding that would indicate that the patient is in danger and should seek further medical evaluation and treatment. This duty is stronger when the physician has no reason to believe that the examinee is aware of the condition and danger.

The court holds that plaintiffs have established by a preponderance of the evidence that the United States owed a duty of care to Stanley Leon Betesh, that they breached this duty when they failed to notify him of his abnormal x-ray, and that breach of this duty was the proximate cause of his death.

## DAMAGES

### *Wrongful death*

 The Maryland wrongful death statute existing at the time of Mr. Betesh's death (April 1969) permitted recovery by decedent's wife, husband, parent, child, or, in certain circum-

*poration*, 8 Cal.3d 551, 105 Cal.Rptr. 358, 503 P.2d 1366 (1972); *O'Donnell v. Pennsylvania R. Co.*, 122 F.Supp. 899 (S.D.N.Y. 1954); *Knox v. Ingalls Shipbuilding Corpo-* *ration*, 158 F.2d 973 (5th Cir. 1947); *Hamilton v. Standard Oil Co.*, 323 Mo. 531, 19 S.W.2d 679 (1929); see Annot., 16 A.L.R.3d 564, 590 (1967).

stances, dependent. Damages were limited to pecuniary loss.[14] The court estimates the present value of Judith (Betesh) Sher's pecuniary loss to be $25,000, and awards damages to her in that amount, plus costs.

### Alice and Leon Betesh

■ The measure of damages recoverable by surviving parents is the pecuniary loss sustained by them as a result of their child's death. Generally, parents may recover only for the value of the services that the deceased child, had he lived, would have rendered to them during his minority. The reason for limiting the award period to the child's minority is that—

> What a minor child may be able or willing to do for his father or mother after he becomes of age, when he has the right to leave the parental roof and set up for himself in life, and before his willingness and ability have been tested by experience, is . . . a matter of conjecture, too vague to enter into an estimate of damages in such a case.

*Agricultural and Mechanical Association v. State el rel. Carty,* 71 Md. 86, 87, 18 A. 37, 38 (1889).

■ Stanley Leon Betesh, severely ill, worked in his father's store. Testimony indicates that he worked creatively and well and contributed to the business. For this he was paid. In addition, his parents frequently gave him and his wife money beyond his salary. At the time of his death, Mr. Betesh was still, of necessity, partly dependent on his parents. There is no record of his pecuniary support of them or of services gratuitously rendered to them sufficient to support an award of damages. Accordingly, Alice and Leon Betesh cannot recover in their wrongful death action.

### Survival

The Maryland survival statute [15] authorizes the executor of decedent's estate to bring any personal action (except slander) that decedent might have brought to recover damages sustained in his lifetime. *Stewart v. United Electric Light & Power Co.,* 104 Md. 332, 65 A. 49 (1906). Decedent's administratrix, Judith (Betesh) Sher, brings this action.

■ Damages recoverable under the statute include physical and emotional pain and suffering, loss of earnings between the time of his injury and the time of his death, and medical and funeral expenses.[16]

■ It is difficult in the extreme to put a price tag on the anguish of a young man, recently married, who knows that he is dying. For much of the last three years of his life Mr. Betesh lived with pain, severe nausea, and knowledge of the growing certainty of his death.

The court finds the Government liable to the decedent's estate in the amount of $75,000.

One thousand dollars is awarded in partial payment of funeral expenses.

Costs have been awarded to Judith (Betesh) Sher in her wrongful death action and need not be considered here.

---

14. The statute, Md.Code, Art. 67 § 4, was amended effective July 1, 1969, to allow recovery for such damages as mental anguish, emotional pain and suffering, loss of society, and loss of marital care. Since Mr. Betesh died prior to the effective date of the amendment, it does not apply to this case. *Wittel v. Baker,* 10 Md.App. 531, 272 A.2d 57 (1970).

15. Md.Code, Art. 93, § 7–401(n) (1957).

16. Plaintiff makes no claim for medical expenses, since the treatment required as a result of the Government's delay in telling Mr. Betesh of his condition was rendered without charge at the National Institutes of Health.