63 P.3d 1076

Christine STANLEY, an individual, Plaintiff–Appellant,

v.

Robert R. McCARVER, Jr., M.D.; Osborn, Nelson & Carr Portable X–Ray, Inc., Defendants–Appellees.

No. 1 CA–CV 02–0328.

Court of Appeals of Arizona, Division 1, Department D.

Feb. 25, 2003.

Karen L. Lugosi, P.C. By Karen L. Lugosi, Phoenix, Attorney for Appellant.

Kent & Wittekind, P.C. By Richard A. Kent, Phoenix, Attorneys for Appellee McCarver.

Renaud, Cook & Drury, P.A. By John A. Klecan and Michael R. Sneberger, Phoenix, Attorneys for Appellee Osborn, Nelson & Carr Portable X–Ray.

## OPINION

EHRLICH, Judge.

¶ 1 Christine Stanley appeals from an order dismissing Osborn, Nelson & Carr Portable X–Ray, Inc. ("ONC") from her lawsuit and from summary judgment in favor of Robert R. McCarver, Jr., M.D. For reasons that follow, we affirm the dismissal of ONC, but we reverse the judgment in favor of Dr. McCarver.

### BACKGROUND

¶ 2 For employment purposes, Mesa Christian Care ("MCC") asked Stanley to undergo a chest x-ray, which she did. An ONC technician took the x-ray, and Dr. McCarver, a radiologist, interpreted the film. Dr. McCarver reported to MCC "a confluent exaggeration of parenchymal markings superimposing the right third rib and interspace anteriorly ... with implications for pneumonia or scarring from old pneumonitis ... [A] nodule density overlying the right sixth rib anteriorly is also noted." Although MCC's policy and procedures stated that the "results of the examination [would be] communicated to the applicant/employee within 72 hours," Stanley was not informed of Dr. McCarver's findings. Ten months later, Stanley was diagnosed with lung cancer that, she alleges, would have been diagnosed more quickly if she had been notified of Dr. McCarver's report.

¶ 3 Stanley sued Dr. McCarver and ONC for negligence.[1] The superior court, relying on *Hafner v. Beck,* 185 Ariz. 389, 916 P.2d 1105 (App.1995), granted Dr. McCarver summary judgment because he "did not offer or intend to treat, care for or otherwise benefit the employee" and therefore lacked the requisite physician-patient relationship with Stanley. Adding that, "[i]f there was a duty, it would be only a duty to inform [Stanley] of the results," which "should have" been accomplished by MCC, the court similarly granted ONC's motion to dismiss. Stanley appealed.

### DISCUSSION [2]

¶ 4 The issue presented is whether a radiologist, to whom a person is referred, but not by a healthcare provider, who detects a medical condition for which further inquiry or treatment is appropriate, has a duty to inform that person. We conclude that the radiologist does have such a duty.

### A.  Dr. McCarver's Liability

¶ 5 The question of a physician's duty in this setting has been addressed differently among courts nationwide. *Reed v. Bojar-*

---

1.  MCC also was sued but dismissed after it filed bankruptcy.

2.  In reviewing a summary judgment in a case such as this one in which there are no disputed material facts, we independently review the superior court's application of the law. *Sherman v. First Am. Title Ins. Co.,* 201 Ariz. 564, 566 ¶ 2, 38 P.3d 1229, 1231 (App.2002).

*ski,* 166 N.J. 89, 764 A.2d 433, 437 (2001). The courts of some jurisdictions have construed the duty narrowly and declined to impose liability absent the presence of a traditional physician-patient relationship. *Id.* at 438. *See, e.g., Felton v. Schaeffer,* 229 Cal.App.3d 229, 279 Cal.Rptr. 713 (1991)(holding that physician not liable based on alleged mis-diagnosis during pre-employment examination absent traditional physician-patient relationship); *Peace v. Weisman,* 186 Ga.App. 697, 368 S.E.2d 319 (1988)(holding that physician not liable absent traditional physician-patient relationship); *Rogers v. Horvath,* 65 Mich.App. 644, 237 N.W.2d 595 (1975)(holding that absence of traditional physician-patient relationship precludes physician liability). In contrast, the courts of other jurisdictions have extended the duty owed by a physician to a patient to settings beyond that of a traditional physician-patient relationship. *See, e.g., Daly v. United States,* 946 F.2d 1467, 1470 (9th Cir.1991)(holding under Washington State law that physician owes duty to person examined for employment because person "foreseeably endangered when examining physicians fail to make known abnormal findings"); *Green v. Walker,* 910 F.2d 291, 296 (5th Cir.1990)(holding under Louisiana law that physician has relationship with person examined as condition of employment); *Meena v. Wilburn,* 603 So.2d 866, 869–70 (Miss.1992)(holding that physician liability for negligence does not depend on physician-patient relationship); *Reed,* 764 A.2d at 443 (holding that physician performing pre-employment physical examination has non-delegable duty to inform patient of potentially serious medical condition). In particular, a "line of cases acknowledges that, even in the absence of a traditional physician-patient relationship in the pre-employment physical context, there is a disclosure requirement where the examination reveals a medical abnormality." *Reed,* 764 A.2d at 439 (discussing *Deramus v. Jackson Nat'l Life Ins. Co.,* 92 F.3d 274 (5th Cir.1996), *cert. denied,* 519 U.S. 1115, 117 S.Ct. 956, 136 L.Ed.2d 843 (1997); *Daly,* 946 F.2d 1467; and *Betesh v. United States,* 400 F.Supp. 238 (D.D.C.1974)).

¶ 6 In the *Reed* case, Arnold Reed underwent a chest x-ray as part of a pre-employment physical examination, and the radiologist who read the film reported to the physician responsible for conducting the examination that the x-ray was abnormal. *Id.* at 434–35. Not only was that information not conveyed to Reed, but the examining physician told Reed that Reed was in good health. *Id.* In fact, Reed had Stage IIB Hodgkin's Disease, and he died approximately one year later. *Id.* A lawsuit was brought by Reed's widow and estate against the physician conducting the physical examination and the radiologist. *Id.*

¶ 7 With regard to the examining physician, the court in *Reed* adopted the following description of the duty owed by one who is retained by a third party:

> [W]hen a person is referred to a physician for a pre-employment physical, a physician-patient relationship is created at least to the extent of the examination, and a duty to perform a professionally reasonable and competent examination exists. A professionally unreasonable examination that is detrimental to the examinee is not immunized from liability because a third-party authorized or paid for the exam. Included within the notion of a reasonable and competent examination is the need to "take reasonable steps to make information available timely to the examinee of any findings that pose an imminent danger to the examinee's physical or mental well being."

*Id.* at 442–43 (quoting *Ranier v. Frieman,* 294 N.J.Super. 182, 682 A.2d 1220, 1224 (App.Div.1996)(quoting *Green,* 910 F.2d at 296)). The court did, however, distinguish between the role of the primary physician and that of the physician to whom a referral was made for additional diagnostic purposes, such as the radiologist or a pathologist, to declare that the court did not intend to convey the principle that the latter category of physician has a duty "to convey the test results directly to the patient." *Id.* at 445 n. 1.

¶ 8 Whether a duty exists is an issue that involves balancing the parties' relationship, the nature of the risk and the public

interest in the proposed solution. *Id.* at 443. (*See also* W. Page Keeton et al., PROSSER & KEETON ON THE LAW OF TORTS § 56 at 374 (5th ed.1984)). "What is crucial is that a relationship is created in which a physician is expected to exercise reasonable care commensurate with his expertise and training, both in conducting the examination and in communicating the results to the examinee." *Id.*

> Concomitantly, the patient is entitled to rely on the physician to tell him of a potential serious illness if it is discovered. Any reasonable person would expect that and the duty to communicate with a patient who is found to be ill is non-delegable. When the doctor who ascertains the abnormality communicates it directly to the patient, he or she has the best chance of obtaining prompt remedial care and the best hope of avoiding falling through the cracks of a multi-party system.

*Id.* The court held that the physician owed Reed a duty of reasonable care because they had entered a relationship to the extent of the examination and the communication of its outcome. *Id.* at 445. It elaborated that Reed had reasonably relied on the physician's "superior knowledge to assess the state of his health. Subsumed in that reliance was an entirely reasonable belief that, if [the physician] had found a potentially life threatening abnormality, he would not have remained silent about it." *Id.*

¶ 9 Similarly, the plaintiff in *Daly* underwent a chest x-ray and tuberculosis test as part of a pre-employment examination. 946 F.2d at 1468. A radiologist discovered an abnormality of the lung but never informed Daly. *Id.* Four years later, however, Daly was diagnosed with sarcoidosis, a disabling disease for which early treatment may halt its progress. *Id.* at 1468–69. While the court refrained from drawing the "exact contours" of the physician's duty to disclose, it was persuaded "that, at a minimum, the radiologist should have notified Daly of the abnormality." *Id.* at 1470.

¶ 10 In *Betesh*, Betesh was not informed of a radiologist's report noting an abnormality in Betesh's chest x-ray. 400 F.Supp. at 241. Betesh later was diagnosed as having Hodgkin's Disease, and, while he had a form of the disease that can be successfully treated at an early stage, his disease had advanced to an incurable stage. *Id.* at 242. Although the court relied in part on particular federal regulations, *id.* at 243–45, it found the physician liable, regardless of any federal regulation, in accord with Maryland law. *Id.* at 245–47. The court stated that a physician is "under a duty to act carefully, not merely in the conduct of the examination but also in subsequent communications to the examinee," *id.* at 246, and held that Maryland law created "a duty [of a physician] to disclose what he had found and to warn the examinee of any finding that would indicate that the patient is in danger and should seek further medical evaluation and treatment." *Id.* at 247. "This duty is stronger when the physician has no reason to believe that the examinee is aware of the condition and danger." *Id.*

¶ 11 This same issue was raised in the context of an examination for life insurance in *Deramus*. 92 F.3d at 275. Deramus alleged that an insurer had a duty to inform him that his blood was found to be positive for Human Immunodeficiency Virus during the examination that the insurer required of all applicants. *Id.* at 277. The court held that, pursuant to Mississippi law, an insurance company has no duty to divulge the results of a medical examination to an applicant, but a physician, regardless whether a physician-patient relationship exists, has a duty to disclose because a physician's "disclosure to, at least, the patient is essential to the treatment and retardation of diseases and other ailments." *Id.* at 280.

¶ 12 In *Hafner*, this court addressed the nature of a physician's duty when the physician had been hired by a third party to conduct an independent medical evaluation of a worker's compensation claimant. The claimant had sued a psychologist who had performed an independent medical examination for the insurance carrier, alleging that the examination fell below the standard of care and that the psychologist had negligently reported incorrect information to the carrier. 185 Ariz. at 390, 916 P.2d at 1106. The court reasoned that, because the carrier had

retained the psychologist to evaluate the claimant and not to treat her, his duty ran only to the carrier. *Id.* at 392, 916 P.2d at 1108.

¶ 13 However, this court clarified its analysis in *Hafner* in *Diggs v. Arizona Cardiologists, Ltd.,* 198 Ariz. 198, 8 P.3d 386 (App. 2000). We held that a cardiologist's brief discussion with a patient's treating physician during which he reviewed the patient's clinical records and rendered advice on the diagnosis and treatment of her medical condition was sufficient to create a duty between the cardiologist and the patient; "an express physician-patient relationship is not a requisite for finding a duty of reasonable care under these circumstances." *Id.* at 199 ¶ 2, 8 P.3d at 387. In reaching this result, the court interpreted the holding in *Hafner,* stating that, in *Hafner,* "the relationship between the parties was so attenuated that, for policy reasons, the plaintiff was not entitled to protection." *Id.* at 201 ¶¶ 16–17, 8 P.3d at 389. "Duty is, after all, merely 'an expression of the sum total of those considerations of policy [that] lead[s] the law to say that the particular plaintiff is entitled to protection.' " *Id.* at 201 ¶ 17, 8 P.3d at 389 (quoting *Ontiveros v. Borak,* 136 Ariz. 500, 508, 667 P.2d 200, 208 (1983)). Indeed, the court followed the Arizona Supreme Court's "traditional approach to duty [by determining] whether a sufficient relationship existed between [a consulting physician and a patient] such that, as a matter of policy, [the physician] owed [the patient] a duty of reasonable care." *Id.* at 201 ¶ 14, 8 P.3d at 389.

¶ 14 In *Diggs,* the court also supported its reasoning with the supreme court's analysis in *Ornelas v. Fry,* 151 Ariz. 324, 727 P.2d 819 (1986), a case on which the court in *Hafner* also had relied to support its holding. *Id.* at 202 ¶ 18, 8 P.3d at 390 (citing *Ornelas,* 151 Ariz. at 329, 727 P.2d at 824). In *Ornelas,* as summarized in *Diggs,* the court found that an anesthesiologist did not owe a duty to an organ donor who unnecessarily lost a donated kidney because the donor had " 'failed to allege or prove the existence of a physician/patient relationship [between the donor and the anesthesiologist] *or any other legal theory which would give rise to any legal duty* on the part of [the anesthesiologist].' " *Id.* (quoting *Ornelas,* 151 Ariz. at 329, 727 P.2d at 824 (emphasis and alteration original)).

¶ 15 Also in *Diggs,* the court not only emphasized a phrase from *Ornelas,* "give rise to any legal duty," it used *Ontiveros* for guidance. *Id.* at 202 ¶ 19, 8 P.3d at 390. As expressed in *Ontiveros,* the supreme court included in tavernkeepers' duties to patrons the "obligation to help control the conduct of his patron in order to prevent that patron from injuring someone else." *Id.* The court "based this extension on the policy of placing duties on those most capable of preventing the harm caused by the intervening negligence of others," which is a policy "guided by one of the underlying principles of our system of tort law: the prevention of future harm." *Id.* (citing Keeton, *supra,* § 4, at 25).

¶ 16 In addition to the case law discussed above, the RESTATEMENT (SECOND) OF TORTS ("Restatement") section 324A (1965), adopted in *Tollenaar v. Chino Valley School District,* 190 Ariz. 179, 181, 945 P.2d 1310, 1312 (1997), provides that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or ... (c) the harm is suffered because of reliance of the other or third person upon the undertaking.

*See Diggs,* 198 Ariz. at 202 ¶ 21, 8 P.3d at 390.[3] Moreover, when " 'the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such risk, the harm results from the negligence as fully as if the actor had created the risk.' " *Id.* (quoting Restatement § 324A cmt. e.).

---

3. "When section 324A makes a person 'subject to liability' for the described conduct, the existence of a duty is assumed." *Diggs,* 198 Ariz. at 202 ¶ 21 n. 1, 8 P.3d at 390 n. 1.

¶ 17 The standards of the medical profession itself strike a balance similar to that by the courts in recognizing the physician's duty in the context of work-related and independent medical examinations. According to American Medical Association ("AMA") Opinion E–10.03, *Patient–Physician Relationship in the Context of Work–Related and Independent Medical Examinations,* an opinion of the AMA's Council on Ethical and Judicial Affairs adopted June 1999 as quoted in *Reed,* 764 A.2d at 444, "[w]hen a physician is responsible for performing an isolated assessment of an individual's health or disability for an employer, business, or insurer, a limited patient-physician relationship should be considered to exist."

> The physician has a responsibility to inform the patient about important health information or abnormalities that he or she discovers during the course of the examination. In addition, the physician should ensure to the extent possible that the patient understands the problem or diagnosis. Furthermore, when appropriate, the physician should suggest that the patient seek care from a qualified physician and, if requested, provide reasonable assistance in securing follow-up care.

*Id.*

■ ¶ 18 The standards of the American College of Radiology ("ACR")[4] are to corresponding effect.

> In those situations in which the interpreting physician feels that immediate patient treatment is indicated (e.g., tension pneumothorax), the interpreting physician should communicate directly with the referring physician, other healthcare provider, or an appropriate representative. *If that individual cannot be reached, the interpreting physician should directly communicate the need for emergent care to the patient or responsible guardian, if possible.* [Emphasis added.]

*ACR Standard for Communication: Diagnostic Radiology,* Section V.[5]

¶ 19 Similarly, in *ACR Standard for the Performance of Screening Mammography,* a test analogous to a screening chest x-ray, Section VII(B)(2)(b)[6] imposes an obligation on the radiologist to communicate the results of the screening mammogram directly to the patient when the patient is self-referred, that is that no physician or comparable healthcare provider sent the patient for the examination.

> For self-referred patients (patients who do not name a healthcare provider), the facility must send or directly give the patient the actual mammographic report and a summary in lay terms no later than 30 days from the date of the mammographic examination. *Reports in the categories of* needs additional imaging evaluation, probably benign short-interval follow-up, *suspicious abnormality,* or highly suggestive of malignancy *should be communicated to the self-referred patient in a manner that ensures receipt and documentation of the report. The report should indicate a need for further consultation with a physician, and a follow-up contact with the patient should be made to determine that she has consulted a physician for follow-up care.* [Emphasis added.]

---

4. The ACR is a national organization that tests and certifies radiologists as specialists in diagnostic radiology and other sub-specialty practices within the general field of radiology. Dr. McCarver has been certified by ACR as a specialist in diagnostic radiology. The ACR publishes *Standards* to "define principles of practice which should generally produce high-quality radiological care." *ACR Standards: Introduction* (rev. Jan.13, 2003). One of the stated purposes of the *Standards* is "to improve the quality of service to patients throughout the United States." *Id.* While the *Standards* are "not deemed inclusive of all proper methods of care or exclusive of other methods of care reasonably directed to obtaining the same results," "it is prudent to document the rationale for any deviation from these suggested standards in the radiologist's policies and procedures manual or, if not addressed there, in the patient's medical record." *Id.* We do not hold that the *Standards* in and of themselves establish a standard of care, but published standards or guidelines of speciality medical organizations are useful in determining the duty owed or the standard of care applicable to a given situation.

5. This Standard was promulgated in 1991 and revised in 1995, 1999 and 2001. The current version became effective on January 1, 2002.

6. This Standard was promulgated in 1990 and amended or revised in 1992, 1994, 1995 and 1999. The current version became effective on January 1, 2000.

¶20 This is the approach that we are persuaded to follow: It is reasonable to expect that the patient's primary physician would obtain the results of the various diagnostic studies ordered, correlate those results with his own findings and evaluate to what degree the patient needed to be advised of the results. However, the physician to whom the referral was made and who performed the diagnostic tests bears no such duty with regard to advising the patient of the results unless there is no referring physician or the referring physician is unavailable, in which case the duty shifts to the testing physician. The point is to ensure that a physician such as the radiologist contacts a responsible person to alert that person to the presence of the matter of concern or abnormality. The "responsible person" well may be the referring physician, but, if there is no referring physician as would be true in a case of a referral by an employer, as it is true of a self-referred patient, the radiologist bears the duty of direct communication with the patient.

¶21 We thus conclude that, in the context of a case such as this one in which an employer has referred a person for an examination, a physician has a duty to exercise reasonable care in conducting the examination and this duty includes communicating about the examination directly to the person examined. This imposition of responsibility protects the person being examined who reasonably and foreseeably relies on the physician conducting the examination to disclose potentially serious threats to the person's health. Given the benefit to the person being examined, any burden imposed on the physician as a result of this duty to inform is slight, an appropriate balance particularly in light of the stronger position of the physician in terms of knowledge. · We reverse the summary judgment granted in favor of Dr. McCarver and remand for such further proceedings as are consistent with this opinion.

*The Honorable Michael O. Wilkinson, a judge of the Maricopa County Superior Court, was authorized to participate as a Judge *Pro Tempore* of the Court of Appeals by order of the Chief Justice of

### B.  ONC's Liability

 ¶22 ONC employed the x-ray technician, gave the film to Dr. McCarver for analysis and relayed Dr. McCarver's report to MCC. Stanley does not allege that ONC performed these tasks negligently. Because Dr. McCarver is an independent contractor, we decline to impose liability on ONC for Dr. McCarver's alleged breach of duty. "The general rule is that while an employer is liable for the negligence of its employee under the doctrine of *respondeat superior*, an employer is not liable for the negligence of an independent contractor." *Wiggs v. City of Phoenix*, 198 Ariz. 367, 369 ¶7, 10 P.3d 625, 627 (2000). We find no reason to deviate from the general rule, and we therefore affirm the order dismissing ONC.

CONCURRING: SHELDON H. WEISBERG, Judge and MICHAEL O. WILKINSON, Judge Pro Tempore *.