SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| CHRISTINE STANLEY, an individual, ) | Arizona Supreme Court |
| ) | No.  CV-03-0099-PR |
| Plaintiff-Appellant, ) | |
| ) | Court of Appeals |
| v. ) | Division One |
| ) | No.  1 CA-CV 02-0328 |
| ROBERT R. McCARVER, JR., M.D.; ) | |
| OSBORN, NELSON & CARR PORTABLE ) | Maricopa County |
| X-RAY, INC., ) | Superior Court |
| ) | No.  CV 00-015923 |
| Defendants-Appellees. ) | |
| _____ ) | **O P I N I O N** |

Appeal from the Superior Court in Maricopa County
The Honorable Roland J. Steinle, III, Judge

**REVERSED AND REMANDED**

_____

Opinion of the Court of Appeals, Division One
204 Ariz. 339, 63 P.3d 1076 (App. 2003)

**AFFIRMED IN PART, VACATED IN PART**

_____

KAREN L. LUGOSI, P.C.                                          Phoenix
     by   Karen L. Lugosi
Attorney for Plaintiff-Appellant

KENT & WITTEKIND, P.C.                                         Phoenix
     by   Richard A. Kent
Attorney for Defendant-Appellee Robert R. McCarver, Jr., M.D.

_____

**B E R C H**, Justice

¶1        This case presents the question whether a radiologist evaluating a chest x-ray for a pre-employment tuberculosis screening owes a duty to the examinee, and, if so, whether the

standard of care imposes on the doctor the obligation to take reasonable steps to make known any serious abnormalities he observes.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

¶2        Dr. Robert R. McCarver, Jr., a radiologist, evaluated a chest x-ray of nurse Christine Stanley as part of a pre-employment tuberculosis screening.  The prospective employer, Mesa Christian Care ("MCC"), contracted with Osborn, Nelson & Carr Portable X-Ray, Inc. ("ONC"), to take the x-ray.  Dr. McCarver interpreted the x-ray pursuant to an independent contract with ONC.  Dr. McCarver concluded, and wrote in his report, that the x-ray showed abnormalities:  a "small nodule overlying the right sixth rib" and a "patchy consolidated parenchymal pattern superimposing the right third rib anteriorly and interspace."  Dr. McCarver sent the report to ONC, which forwarded it to MCC.  Although company policy required MCC to notify Ms. Stanley of the results within seventy-two hours, MCC apparently did not do so.  Approximately ten months later, Ms. Stanley was diagnosed with lung cancer.

¶3        Ms. Stanley sued MCC, ONC, and Dr. McCarver, alleging that the Defendants "provided negligent and improper medical

---

[1]        Because this case was decided on summary judgment, we must view the facts in the light most favorable to Ms. Stanley, the non-moving party.  *Dickey v. City of Flagstaff*, 205 Ariz. 1, 2 n.2, 66 P.3d 44, 45 n.2 (2003) (citing *Orme Sch. v. Reeves*, 166 Ariz. 301, 309-10, 802 P.2d 1000, 1008-09 (1990)).

care" by failing to "timely and adequately diagnose and/or communicate to [her] the abnormality evident on her chest x-ray." She implies that she would have had a better chance of recovery had she learned of her cancer sooner and begun treatment earlier.

¶4    MCC declared bankruptcy and was dismissed from the action, and the trial court, relying on *Hafner v. Beck*, 185 Ariz. 389, 916 P.2d 1105 (App. 1995), granted summary judgment to Dr. McCarver and dismissed ONC from the case. The court of appeals affirmed the order dismissing ONC, but reversed the grant of summary judgment to Dr. McCarver, holding that he did owe a duty to Ms. Stanley. *Stanley v. McCarver*, 204 Ariz. 339, 345, ¶¶ 21-22, 63 P.3d 1076, 1082 (App. 2003). We granted Dr. McCarver's petition for review to determine whether he owed a duty to Ms. Stanley under the facts of this case. We have jurisdiction pursuant to Article 6, Section 5(3) of the Arizona Constitution.

**DISCUSSION**

¶5    To maintain this negligence action, Ms. Stanley must show that Dr. McCarver had a legal obligation to protect her from injury or harm — a duty in the parlance of tort law. *See Markowitz v. Ariz. Parks Bd.*, 146 Ariz. 352, 354, 706 P.2d 364, 366 (1985). Whether such a duty exists is a matter of law for this court to determine de novo. *Id.*

¶6     Despite the absence of a doctor-patient relationship between the parties, Ms. Stanley asserts that Dr. McCarver was required to use care and professional skill in reading her x-ray and to reasonably report the results of the x-ray.  To determine whether a duty exists, courts examine several sources, including the state's statutes and controlling cases.  Jefferson L. Lankford & Douglas A. Blaze, THE LAW OF NEGLIGENCE IN ARIZONA § 1.02 at 1-2 to 1-3 (3d ed. 2003).  But no Arizona statute addresses the issue before us and, other than the court of appeals decision in this case, no reported Arizona opinion has permitted recovery in the circumstances presented here.  *See Stanley*, 204 Ariz. at 345, ¶ 21, 63 P.3d at 1082.

¶7     Duties may also arise from a special relationship between the parties, a relationship that may find its basis in contract, family relations, or undertakings.  *See Hislop v. Salt River Project Agric. Improvement and Power Dist.*, 197 Ariz. 553, 557, ¶ 21, 5 P.3d 267, 271 (App. 2000).  In keeping with the contract or "undertaking" bases, the traditional rule has been, as our dissenting colleague correctly notes, that a formal doctor-patient relationship was necessary before tort liability could be imposed for negligent diagnosis or care.  *See, e.g., Hafner*, 185 Ariz. at 391, 916 P.2d at 1107 (finding no duty to claimant given an independent psychological examination for worker's compensation purposes because there was no doctor-

- 4 -

patient relationship); *see also Felton v. Schaeffer*, 279 Cal. Rptr. 713 (App. 1991); *Peace v. Weisman*, 368 S.E.2d 319 (Ga. Ct. App. 1988). The requirement of a formal relationship has never been absolute, however. More than a century ago, for example, a Massachusetts court recognized that a doctor's failure to properly diagnose a patient referred by another could result in liability to the patient for negligence. *See Harriott v. Plimpton*, 44 N.E. 992 (Mass. 1896) (remanding to jury case of fiancé sent to doctor by future father-in-law to rule out existence of venereal disease; misdiagnosis caused engagement to break up).

¶8        The requirement of a formalized relationship between the parties has been quietly eroding in several jurisdictions. *See Betesh v. United States*, 400 F. Supp. 238, 245-47 (D.D.C. 1974); *Dyer v. Trachtman*, 679 N.W.2d 311, 314-15 (Mich. 2004); *Reed v. Bojarski,* 764 A.2d 433, 442-43 (N.J. 2001). It has been eroding in Arizona as well, and, when public policy has supported the existence of a legal obligation, courts have imposed duties for the protection of persons with whom no preexisting "relationship" existed. *E.g., Lombardo v. Albu*, 199 Ariz. 97, 99-100, ¶¶ 10-12, 14 P.3d 288, 290-91 (2000) (imposing duty on a purchaser's real estate agent to deal fairly with sellers); *accord Tarasoff v. Bd. of Regents*, 551 P.2d 334, 340 (Cal. 1976) (imposing duty on mental health workers to warn of

threat of immediate harm to third party).

¶9     Indeed, at least one Arizona case has held that a formal doctor-patient relationship need not exist before a duty may be imposed on the doctor. *See Diggs v. Ariz. Cardiologists, Ltd.*, 198 Ariz. 198, 199, 201, ¶¶ 2, 14, 8 P.3d 386, 387, 389 (App. 2000). In *Diggs*, a cardiologist advised an emergency room doctor regarding Ms. Diggs' care, knowing that the ER doctor would rely on the advice. *Id*. at 202-03, ¶¶ 20-23, 8 P.3d at 390-91. In finding that the cardiologist owed Ms. Diggs a duty of reasonable care, the court reasoned that while an "express contractual physician-patient relationship clearly gives rise to a duty to the patient, the absence of such a relationship does not necessarily exclude a duty to the patient." *Id.* at 202, ¶ 14, 8 P.3d at 390. We agree.

¶10     The parties appear to agree that there was no traditional doctor-patient relationship between them. Nonetheless, Ms. Stanley maintains that a relationship between individuals such as that between herself and Dr. McCarver supports the imposition of a legal obligation to act for the benefit of the examinee. *See* William L. Prosser, HANDBOOK OF THE LAW OF TORTS § 42, at 244 (4th ed. 1971); *cf. Betesh*, 400 F. Supp. at 245 (noting that "[e]ven in the absence of a doctor-patient relationship, a doctor who assumes to act must act carefully with respect to all aspects of the examination"). And

- 6 -

in fact this court has recognized that the proper inquiry is whether a *sufficient* relationship exists between the parties to make it reasonable, as a matter of public policy, to impose a duty. *Markowitz*, 146 Ariz. at 356, 706 P.2d at 368; *see also Green v. Walker*, 910 F.2d 291, 296 (5th Cir. 1990) (imposing limited doctor-patient relationship to correspond with the extent of the examination).

¶11    Although no previous Arizona case has considered the precise issue posed by this case, courts in other states have recognized that liability may be imposed in the absence of a doctor-patient relationship. In *Green*, 910 F.2d at 296, for example, the Fifth Circuit found, between an employee and the doctor conducting an annual physical, a limited doctor-patient relationship that was sufficient to give rise to a duty of care in conducting the examination and reporting its results. The Ninth Circuit Court of Appeals has similarly recognized an obligation to report abnormal results obtained during a pre-employment physical examination, despite the absence of a doctor-patient relationship. *Daly v. United States*, 946 F.2d 1467, 1468 (9th Cir. 1991) (interpreting Washington law); *see also Betesh*, 400 F. Supp. at 245-47 (holding as a matter of Maryland law that employer-retained radiologists who observed abnormalities owed a duty of care and breached it by failing to notify the examinee); *Meena v. Wilburn*, 603 So. 2d 866, 870

(Miss. 1992) (observing that the absence of a doctor-patient relationship is merely one factor in determining the standard of care owed); *Reed*, 764 A.2d at 443 (finding that the absence of a traditional doctor-patient relationship does not preclude imposing a duty on the examining doctor, the fulfillment of which may require informing the patient of abnormalities); *Meinze v. Holmes*, 532 N.E.2d 170, 173-75 (Ohio Ct. App. 1987) (containing dictum that insurer-retained doctors had a duty to communicate a significant risk of danger to the plaintiff, even in the absence of a doctor-patient relationship).[2] Although the facts in these cases differ from those at issue before us, all these courts have recognized that in placing oneself in the hands of a medical professional, even at the request of one's employer or insurer, one may have a reasonable expectation that the "expert will warn of 'any incidental dangers of which he is congnizant due to his peculiar knowledge of his

---

[2] Other cases suggest such a result as well. *E.g.*, *Union Carbide & Carbon Corp. v. Stapleton*, 237 F.2d 229 (6th Cir. 1956) (interpreting Tennessee law, finding duty by employer); *Dornak v. Lafayette Gen. Hosp.*, 399 So. 2d 168 (La. 1981) (interpreting civil code); *Dyer*, 679 N.W.2d at 317 (finding a limited doctor-patient relationship in the context of an independent medical examination for litigation purposes); *Cleghorn v. Hess*, 853 P.2d 1260 (Nev. 1993) (concluding that required pre-employment examination creates a relationship between the doctor and prospective employee, at least to the extent of the tests conducted); *Baer v. Bd. of Regents*, 884 P.2d 841 (N.M. Ct. App. 1994) (remanding for determination whether doctor who found abnormality in course of periodic physical fulfilled his duty to the examinee by referring the patient to his regular physician).

specialization.'" *Green*, 910 F.2d at 296 (quoting *Am. Mfrs.*
*Mut. Ins. Co. v. United Gas Corp.*, 159 So. 2d 592, 595 (La. Ct.
App. 1964)).

¶12     We find the reasoning in these cases compelling.  Many
courts treat the existence of a formal doctor-patient
relationship as merely one factor to consider in analyzing
whether a duty should be imposed.  *E.g.*, *Meena*, 603 So. 2d at
870.  Such an interpretation comports with Arizona courts' focus
on the sufficiency of the relationship as a basis for imposing a
duty.  *E.g.*, *Markowitz*, 146 Ariz. at 356, 706 P.2d at 368.
Other courts examine the extent of the relationship and the type
of tests conducted by the doctor to determine the extent of the
duty, or what we would call the standard of care.  *E.g.*,
*Cleghorn v. Hess*, 853 P.2d 1260, 1263-64 (Nev. 1993).  To
determine whether a duty exists, some courts consider such
factors as whether the doctor was in a unique position to
prevent harm, the burden of preventing harm, whether the
plaintiff relied upon the doctor's diagnosis or interpretation,
the closeness of the connection between the defendant's conduct
and the injury suffered, the degree of certainty that the
plaintiff has suffered or will suffer harm, the skill or special
reputation of the actors, and public policy.  *E.g.*, *Parsons v.*
*Crown Disposal Co.*, 936 P.2d 70, 80 (Cal. 1997).  These are
appropriate inquiries that illuminate the concerns that motivate

tort liability.

**¶13**     In the case before us, although there was no traditional doctor-patient relationship between the parties, Dr. McCarver did agree, for consideration, to interpret Ms. Stanley's confidential medical record, her x-ray, and accurately report the results to ONC.  By doing so, he undertook a professional obligation with respect to Ms. Stanley's physical well being.  Having placed himself in such a position, his special skill and training made him aware of abnormalities in the x-ray that one lacking such training could not observe.  As a result of his undertaking, Dr. McCarver recognized the existence of abnormalities on the x-ray that may have evidenced an unreasonable risk of harm to Ms. Stanley of which she was unaware.  Despite the lack of a traditional doctor-patient relationship, Dr. McCarver should have anticipated that Ms. Stanley would want to know of the potentially life-threatening condition and that not knowing about it could cause her to forgo timely treatment, and he should have acted with reasonable care in light of that knowledge.[3]

**¶14**     By virtue of his undertaking to review Ms. Stanley's x-ray, Dr. McCarver placed himself in a unique position to

---

[3]     Because MCC had a policy of advising employee applicants within seventy-two hours of MCC's "receipt of the final results," Ms. Stanley might reasonably have assumed that, having heard nothing, no threat to her health was revealed by the x-ray.

- 10 -

prevent future harm to Ms. Stanley. In such a circumstance, an examinee reasonably expects the physician to sound the alarm if any serious abnormality is discovered. Although our dissenting colleague notes that courts in many jurisdictions have not imposed a duty in such situations, *see infra* ¶ 30, the trend now favors imposing a duty and we can envision no public benefit in encouraging a doctor who has specific individualized knowledge of an examinee's serious abnormalities to not disclose such information. We conclude that public policy is better served by imposing a duty in such circumstances to help prevent future harm, even in the absence of a traditional doctor-patient relationship.

**¶15** The imposition of a duty in these circumstances also comports with the Restatement (Second) of Torts § 324A (1965), which Arizona courts have applied in other contexts. *See Tollenaar v. Chino Valley Sch. Dist.*, 190 Ariz. 179, 180, 945 P.2d 1310, 1311 (App. 1997); *Thompson v. Sun City Cmty. Hosp.*, 141 Ariz. 597, 608, 688 P.2d 605, 616 (1984) (applying related Restatement § 323). Section 324A suggests imposing a duty on one "who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person." It provides that a person "is subject to liability to the third person . . . if (a) his failure to exercise reasonable care increases the

risk of . . . harm, or . . . (c) the harm is suffered because of reliance of . . . the third person upon the undertaking." Restatement, *supra*, § 324A; *see also* Dan B. Dobbs, THE LAW OF TORTS §§ 320-21, at 864-73 (2001 & Supp. 2003). Dr. McCarver appears to have undertaken, for consideration, to read Ms. Stanley's x-ray and to render an opinion on whether the x-ray revealed the presence of tuberculosis. Because this case was decided virtually at the pleading stage,[4] Ms. Stanley has not had the opportunity to show whether Dr. McCarver's actions increased the risk of harm to her beyond that which existed in the absence of his undertaking or whether she relied on his undertaking. She should have her day in court to make that showing.

¶16    Having concluded that a duty exists, we should say what the duty is. As Prosser notes, in negligence cases "the duty is always the same[:] to conform to the legal standard of reasonable conduct in the light of the apparent risk." Prosser, *supra* ¶ 10, § 53 at 324. The standard of care imposes on those with special skills or training, however, the higher obligation to act in light of that skill, training, or knowledge,[5] and may

---

[4]    Although the case was decided on summary judgment, the only issue presented in that motion was whether Dr. McCarver owed any duty to Ms. Stanley.

[5]    This standard is supported by Arizona Revised Statutes section 12-563(1) (2003), which provides that, to establish a claim of medical malpractice, a plaintiff must prove that

be breached either by acts of communication (misfeasance) or omission (nonfeasance). Dr. McCarver therefore assumed a duty to conform to the legal standard of care for one with his skill, training, and knowledge. As noted in ¶¶ 17 and 19, what is necessary to satisfy the standard will depend upon the facts of each case.

¶17    While we agree with the court of appeals that Dr. McCarver owed a duty of reasonable care to Ms. Stanley, we depart company with respect to that court's definition of the duty. Relying heavily on the American Medical Association's Ethical Opinion E-10.03 (June 1999), section V of the Standards of the American College of Radiology (2001) (regarding communication of diagnoses), and section VII(B)(2)(b) of the American College of Radiology's Standards for the Performance of Screening Mammography (2000), the court of appeals held that a radiologist had a duty to report abnormalities directly to the patient if "there is no referring physician or the referring physician is unavailable." *Stanley*, 204 Ariz. at 345, ¶ 20, 63 P.3d at 1082. We decline to find a duty to report directly to the patient based upon the medical profession's ethical standards because such a notion conflates the existence of a

---

[t]he health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances.

duty with the standard of care.[6]  *See Markowitz*, 146 Ariz. at 356-57, 706 P.2d at 368-69.  We do agree with the court of appeals that the duty imposed is to act as a reasonably prudent health care provider in the circumstances.  *Stanley*, 204 Ariz. at 345, ¶ 21, 63 P.3d at 1082.  But whether this duty requires direct communication with the subject of the x-ray regarding any abnormalities discovered may depend upon factors such as whether there is a treating or referring physician involved in the transaction, whether the radiologist has means to identify and locate the patient, the scope of — including any contractual limitations on — the radiologist's undertaking, and other factors that may be present in a particular case.

¶18     In this case, Ms. Stanley has alleged two breaches of Dr. McCarver's duties.  First, she alleges that he failed to properly interpret the x-ray in question.  Yet Dr. McCarver and

---

[6]     We have similarly declined to use the court's own ethical standards as a basis upon which to impose legal malpractice liability.  Ariz. R. Sup. Ct. 42, R. Prof. Resp., Preamble, Scope ¶ 20 (noting that rules of professional responsibility "are not designed to be a basis for civil liability").  While rules of professional conduct may provide evidence of how a professional would act, they do not create a duty or establish a standard of care as a matter of law.

The dissent analogizes to a lawyer's ethical duty to report intended criminal conduct that is likely to result in serious bodily harm or death to support the imposition of a duty in *Tarasoff*.  *See* dissent ¶ 32 (citing Ariz. R. Sup. Ct. 42, ER 1.6).  We note, in response, that implying a duty based on the analogous ethical rules for radiologists suggests the imposition of the duty in this case as well.  We continue to believe, however, that while such rules may illuminate the standard of care, they do not serve as a basis on which to impose a duty.

ONC agree, and Ms. Stanley has not disputed, that Dr. McCarver was an independent contractor, hired only to do a pre-employment screening to rule out the presence of tuberculosis. The record is devoid of evidence that he undertook to diagnose any other conditions that might be ascertainable from the x-ray or had a doctor-patient relationship with Ms. Stanley that would require him to do so. Ms. Stanley agrees that Dr. McCarver observed and reported other abnormalities, such as a "small nodule overlying the right sixth rib" and a "patchy consolidated parenchymal pattern" on the right rib that might indicate the presence of pneumonia scarring or present pneumonia and suggested the need for serial x-rays to determine "stability." Ms. Stanley complains, however, that Dr. McCarver did not rule out tuberculosis. We fail to see, however, even if that were true, how that failure harms Ms. Stanley, for it is undisputed that she does not have tuberculosis. Therefore, even had Dr. McCarver read the x-ray flawlessly, he would not have observed or reported the presence of tuberculosis.

¶19     Second, she alleges that he failed to report the results of the x-ray directly to her. But whether Dr. McCarver acted reasonably by advising ONC of his interpretation of the x-ray is a matter of the standard of care, to be resolved by the trier of fact on remand. The jurors may consider whether MCC's failure to follow its own policy requiring it to advise Ms.

Stanley of the abnormal x-ray comparatively reduces Dr. McCarver's negligence, if any. And they may consider whether, by notifying ONC, Dr. McCarver discharged his duty by providing notice of his findings reasonably calculated to result in notice to Ms. Stanley. *See, e.g., Meinze*, 532 N.E.2d at 172 (concluding that a duty to inform was fulfilled when medical reports were sent to patient's attorney). All we hold today is that a radiologist who interprets a pre-employment x-ray may not necessarily escape liability simply because the subject of the x-ray was not a "patient" in the traditional sense. The discharge of the radiologist's duty requires the doctor to take reasonable steps appropriate under the circumstances.

¶20    Dr. McCarver urges that imposing a duty on radiologists who perform pre-employment interpretations of x-rays will "chill" doctors from doing pre-employment exams and open the floodgates of litigation. We are not persuaded. We suspect, based upon the ethical standards governing radiologists, that most radiologists do in fact communicate with some responsible party when a serious abnormality is discovered. The paucity of case law on this subject further indicates that this is true. It also suggests that the threatened flood of litigation might instead be a trickle. *Cf. Union Carbide*, 237 F.2d at 232-33 (imposing related duty, but apparently not opening floodgates of litigation). Finally, we note that

doctors may deal with this issue as a matter of contract. They may, for example, require x-ray subjects to consent to having the results reported only to the employers.

¶21     In dissent, our colleague expresses concern that the duty the majority recognizes may "subject the doctor to liability in tort for a medical condition that was not caused by negligence of the doctor." *See infra* ¶ 24. Ms. Stanley sues, however, not for her cancer, but for the lost opportunity to treat it. She may not be able to establish that the time between the reading of the x-ray and the discovery of the cancer would have improved her chances of recovery, if indeed she can establish a breach of duty. We do not opine that Dr. McCarver has breached any duty. Rather, that issue is remanded to the jury for determination. We hold only that a doctor who, for consideration, undertakes to read x-rays, on which he observes serious abnormalities, must act reasonably in reading the x-rays and reporting the results.

¶22     We do not impose the duty, as suggested by the dissent, solely because the doctor is in a position to prevent future harm. Indeed, we recognize that prevention of harm alone will not support the imposition of a duty. *See* Prosser, *supra* ¶ 10, § 56 at 340-43 (citations omitted). The duty emanates from the panoply of social concerns that generally inform tort law. *See supra* ¶¶ 9-12. We simply conclude that the absence of a

formal doctor-patient relationship does not necessarily insulate a doctor from liability.[7]

**CONCLUSION**

¶23     We conclude that the absence of a formal doctor-patient relationship does not necessarily preclude the imposition of a duty of care.  We affirm that portion of the opinion of the court of appeals imposing a duty, but vacate the remainder of the opinion.  We reverse the decision of the trial court and remand the case for further proceedings.

_____
                        Rebecca White Berch, Justice


CONCURRING:


_____
Ruth V. McGregor, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice

_____

[7]     We do not imagine, for example, that if Dr. McCarver falsely told the employer that Ms. Stanley had tuberculosis when she did not, thus denying her employment, or put her confidential medical information on the internet that the absence of a formal doctor-patient relationship would preclude a lawsuit.

**J O N E S,** Chief Justice, respectfully dissenting

¶24     Dr. McCarver did nothing more than evaluate Ms. Stanley's pre-employment x-ray at the request of a prospective employer relative to an informed hiring decision. He did not see Ms. Stanley and was never approached by her for medical treatment. No physician-patient relationship existed, nor was there any particular relationship between the two. Nevertheless, the majority holds the doctor undertook a duty of care toward Ms. Stanley, the breach of which could subject the doctor to liability in tort for a medical condition that was not caused by negligence of the doctor. No legal authority is cited that would extend a duty of care in that circumstance. For reasons explained below, I would hold that imposition of a duty on the doctor in these circumstances constitutes an extension of the concept of duty that is unjustified as a matter of law.

¶25     In holding that Dr. McCarver should take steps reasonably calculated to apprise Ms. Stanley of her condition, the majority reasons that although no traditional physician-patient relationship existed between the parties, the doctor "placed himself in a unique position to prevent future harm to Ms. Stanley" and that "[i]n such a circumstance, an examinee reasonably expects the physician to sound the alarm if any potentially serious abnormality is discovered." Op. ¶ 14. I disagree because I cannot agree that the doctor was uniquely

placed to prevent future harm. Moreover, the personal expectations of an injured party do not involve legal determinations, but are factual matters directly related to, and thus part of, the standard of care determination to be made by the jury as the trier of fact. This principle is bolstered by the notion that expectations vary enormously, person to person, circumstance to circumstance, and thus must be found reasonable in their application, case by case. In contrast, duty can exist only as a matter of law. Thus, unless the duty to be imposed on a defendant can be supported by a legitimate legal source, the personal expectations of an injured plaintiff become legally irrelevant.

¶26    The majority struggles to identify a duty source, referring to such notions as the plaintiff's reliance on the doctor for diagnosis, the relationship between the defendant's conduct and the injury sustained, the degree of certainty that the plaintiff will suffer harm, the skill or reputation of the doctor, the defendant being positioned to prevent harm, or public policy. Op. ¶ 12. In my view of the record before us, the remoteness of any connection between Ms. Stanley's general health and Dr. McCarver's narrow undertaking as an independent contractor to read a tuberculosis screening x-ray for employment purposes is much too attenuated to bring the case within any possible source of duty mentioned by the majority.

¶27    The majority cites *Diggs v. Arizona Cardiologists, Ltd.*, 198 Ariz. 198, 8 P.3d 386 (App. 2001). There, the court noted that the doctor, a cardiologist in the hospital emergency room at the time, was in the "unique position to prevent future harm to Mrs. Diggs." *Id.* at 202, ¶ 20, 8 P.3d at 389. Still, the basis on which the doctor's duty was found to exist was not his ability to prevent future harm, but rather, the foreseeable reliance on the doctor's medical opinion that resulted in Mrs. Diggs' release from the emergency room. *Id.* ¶ 22. *Diggs* simply stands for the logical proposition that an emergency room doctor who gives a medical opinion as the basis for the decision to release the patient or continue the treatment has assumed a duty of care to that patient.

¶28    While the *Diggs* rationale might be applied in other cases asserting medical malpractice, I would find it inapplicable here. Because Ms. Stanley's x-ray was to be used solely to determine employability rather than continued treatment, Dr. McCarver could not have anticipated patient reliance as a basis for future medical treatment in the way that Mrs. Diggs relied on the emergency room doctor's assessment of her eligibility for release from the hospital.

¶29    A finding of duty in the field of negligence, must rest on solid legal ground. Thus, we should not rely, in the absence of a particular relationship, on a concept as undefined

as "a panoply of social concerns," Op. ¶ 22, from which to draw legal notions of duty. Otherwise, endless circumstances might be imagined in which duty is found between persons without a relationship, unconnected in any meaningful way. Admittedly, numerous examples might arise in which a "moral" obligation may manifest itself, but these do not create a "legal" duty offering potential plaintiffs an opportunity to sue in tort.

¶30     I find no other jurisdiction that has extended the concept of duty to include a person so remotely connected to the plaintiff as is Dr. McCarver in the case at bar. Nevertheless, the majority uses language from cases that do not directly support the proposition Ms. Stanley advances to fashion the rule it adopts today.

¶31     Thus, today's opinion cites cases supporting the notion that a preexisting relationship between plaintiff and defendant need not exist if public policy can mandate the imposition of a duty. *See Lombardo*, 199 Ariz. at 99-100, 14 P.3d at 290-91; *see also Tarasoff v. Bd. of Regents*, 551 P.2d 334 (Cal. 1976). I disagree with that general proposition, but even assuming public policy, by itself, could give rise to a legal duty, the policy alleged in the instant case is not compelling. For example, in *Lombardo*, this court held that a buyer's real estate agent was obliged to disclose to the seller facts critical to the buyer's ability to perform the purchase

agreement.  *Lombardo*, 199 Ariz. at 100, ¶ 13, 14 P.3d at 291.

But we noted in that case, because the buyer owed the duty, agency principles dictated that her agent had the same duty. *Id.; see also* Restatement (Second) of Agency § 348 cmt. e (1958) ("[I]f the agent knows that the principal does not intend to perform the contract because of hopeless insolvency or other reason, the making of a contract for him under such conditions subjects the agent to liability.").  To have held otherwise would allow a party to a contract, through an agent, to deal unfairly with all other parties to a transaction.  *Lombardo*, 199 Ariz. at 100, ¶ 14, 14 P.3d at 291.  The imprudence in that result is self-evident.

¶32     Similarly, the California Supreme Court in *Tarasoff* held that a mental health expert whose patient *intended* to harm a third person owed a duty of reasonable care to protect the targeted victim.  551 P.2d at 340.  The mental health expert was privy to vital information and therefore knew his patient was bent on taking the life of another.  Policy reasons underlying *Tarasoff* are akin to the Arizona Rules of Professional Conduct which impose an ethical duty on lawyers to report *intended* criminal conduct where serious bodily injury or death is at stake.  *See* Ariz. R. Sup. Ct. 42, ER 1.6(b).  Again, recognizing the immediacy of the intentional threat to life or person, it is a simple matter to understand why sound policy imposes such a

duty.

¶33    Arizona cases illustrate the need for this court to allow the legislature to define the public policy of the state. In *Brannigan v. Raybuck*, 136 Ariz. 513, 516-17, 667 P.2d 213, 216-17 (1983), and *Ontiveros v. Borak*, 136 Ariz. 500, 508, 511, 667 P.2d 200, 208, 211 (1983), the issue was whether a tavern owner should be duty-bound to withhold intoxicants from a patron to prevent the patron from later injuring third parties. *Brannigan*, 136 Ariz. at 515-16, 667 P.2d at 215-16; *Ontiveros*, 136 Ariz. 508, 511, 667 P.2d 208, 211.  Finding that such duty indeed did exist, the court recognized that its rationale at least in part turned on the existence of a statute "constitut[ing] legislative recognition of the foreseeable danger to both the patron and third parties, and an effort to meet that danger by enactment of laws designed to regulate the industry, [and] *to protect third persons*."  *Brannigan*, 136 Ariz. at 517, 667 P.2d at 217 (emphasis added); *see also Ontiveros*, 136 Ariz. at 509, 667 P.2d at 209 ("Even if the existence of a tavern owner's duty to act with care when furnishing liquor to patrons could not be found by application of common law principle and authority, its existence could be postulated upon the affirmative requirements of statute.").

¶34    Conversely, while the legislature in the instant case could have subjected Dr. McCarver to a duty similar to that

imposed on tavern owners, it has not done so. Further, given the immediacy of the threat of an intoxicated person causing harm to third parties by driving drunk, the principle in favor of a duty imposed on tavern owners is by no means difficult to comprehend as a worthwhile extension of sound public policy. In the instant case, we have no declaration of policy and I perceive no similar threat of immediate harm to innocent third persons brought about by the actions of a tortfeasor.

¶35     On this record, I find it impossible to identify an adequate policy source to justify the imposition of a duty of care on Dr. McCarver in favor of Ms. Stanley. We are dealing with a pre-employment x-ray screening evaluation, nothing more. There is no physician-patient or other special relationship between Ms. Stanley and Dr. McCarver. Indeed, there was no indication in the record that Ms. Stanley could identify the doctor who would perform the evaluation. Ms. Stanley had no contact with the doctor. Even in *Reed* (cited by the majority), the case perhaps most supportive of the majority view, where the Supreme Court of New Jersey found that a doctor performing a pre-employment screening owed a duty to a prospective employee, direct and personal contact between the prospective employee and the doctor in fact took place.[8]

---

[8]     It is also noteworthy that in *Reed*, the original lawsuit named two doctors – one who conducted Reed's physical, and a

¶36     I believe, as Dr. McCarver argues and as the vast majority of courts would conclude, that a duty of care should not be imposed on an evaluating doctor where treatment is not involved and where there is no physician-patient or other particular relationship. *See, e.g., Ramirez v. Carreras*, 10 S.W.3d 757, 761 (Tex. App. 2000) (physician examined employee to determine fitness to return to work following an injury; held, "when a physician examines a person for the benefit of a third party and no physician-patient relationship exists, the only duty owed by the physician is the duty not to injure the examinee"); *Ney v. Axelrod*, 723 A.2d 719, 721, ¶ 8 (Pa. Super. 1999) ("Where a third party has sponsored a medical examination of a person and the person later alleges negligence on the part of the physician who performed the examination, that person cannot succeed on a negligence cause of action.") (citation omitted); *Peace v. Weisman*, 368 S.E.2d 319, 320 (Ga. App. 1988) (finding no liability, in absence of a physician-patient relationship, where doctor failed to diagnose lung cancer during examination to determine patient's eligibility for Social Security benefits); *Keene v. Wiggins*, 69 Cal. App. 3d 308, 313 (Cal. Ct. App. 1977) ("[W]here no physician-patient relationship

---

radiologist who was responsible for reading Reed's chest x-ray. *Reed*, 764 A.2d at 435. The radiologist, who had no personal contact with Reed, but merely reported the results of the x-ray to a third party (the doctor performing the physical), was dismissed from the lawsuit on summary judgment. *Id.*

exists the doctor's only duty is to conduct the examination in a manner not to cause harm to the person being examined. The physician acts as an agent of the person requesting the examination and absent special circumstances, his duty to observe good standards of professional skill in reporting the results of the examination runs only to the person employing him.") (citation omitted). Each of these cases indicates with ample clarity the parameters of *duty* on the facts of the case before us.

¶37     Finally, I believe that the Restatement (Second) of Torts § 324A (1965), cited by the majority, is inapplicable in the instant case. That section applies to a person who undertakes to render services to another, "which he should recognize as necessary for the protection of a third person." *Id.* Dr. McCarver undertook to read Ms. Stanley's x-ray solely to inform a prospective employer of Ms. Stanley's employability. Nothing in the record suggests the doctor was duty bound to "recognize" this tuberculosis screening "as necessary" for Ms. Stanley's protection.

¶38     For the foregoing reasons, I would vacate the opinion of the court of appeals and reinstate the trial court's grant of summary judgment in favor of Dr. McCarver.

_____
Charles E. Jones, Chief Justice